## CARTELLO v. UNITED STATES
### and four other cases.
### Nos. 10915–10919.

Circuit Court of Appeals, Eighth Circuit.
Nov. 29, 1937.

John G. Madden, of Kansas City, Mo. (T. J. Madden, Harry R. Freeman, James E. Burke, Alfred Kuraner, and Madden, Freeman & Madden, all of Kansas City, Mo., on the brief), for appellants.

Thomas A. Costolow, Asst. U. S. Atty., of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., and Randall Wilson, Richard K. Phelps, and Sam C. Blair, Asst. U. S. Attys.,

all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

Appellants, with two others, were indicted for violation of section 19 of the Criminal Code (section 51, title 18 U.S.C.A.) in the conduct of the general November election of 1936 in an election precinct at Kansas City, Mo. The substance of the overt acts charged was that appellants, four of them election officers and one a party worker, caused a false count, record, and return to be made and certified to the board of election commissioners by changing some thirty straight Republican ballots so as to indicate that they were voted as straight Democratic ballots. They filed demurrers to the indictment, pleas in abatement based upon the alleged prejudicial character of the charge to the grand jury, and motions to quash the petit jury panel because of the method employed in selecting the jury list. The demurrers and pleas in abatement were overruled, and the motions to quash were denied.

We shall refer to the parties as they appeared in the lower court.

At the close of the government's testimony, the defendants moved for directed verdicts of not guilty, which were denied, and they thereupon elected to stand upon their motions, and went to the jury on the government's own testimony. Verdicts of guilty were returned, and from the judgments entered thereon these appeals have been perfected.

As in Walker et al. v. United States (C.C.A.) 93 F.2d 383, submitted at the time of the submission of this case, it is urged as grounds for reversal that (1) the indictment does not charge a federal offense; (2) the charges to the grand jury were improper and prejudicial; (3) the petit jurors were improperly selected; and (4) there was an improper exclusion of residents of Kansas City and Jackson county from the petit jury panel.

These questions have all been considered in the Walker Case and decided adversely to the contentions of the defendants in this case, and we therefore pretermit any further reference to them in this opinion.

Defendants also urge that their motions for directed verdicts should have been sustained because of the insufficiency of the evidence to establish their guilt, and in our view of the case as disclosed by the record, this is the only question requiring our consideration.

The gist of the offense is the unlawful conspiracy. Smith v. United States (C.C.A. 8) 157 F. 721; Steedle v. United States (C.C.A.3) 85 F.2d 867, 107 A.L.R. 1361. As the jury found the defendants guilty, that view of the evidence and the reasonable inferences deducible therefrom must be taken which is most favorable to the government. Galatas v. United States (C.C.A. 8) 80 F.2d 15; Marx v. United States (C.C.A.8) 86 F.2d 245. With these thoughts in mind, we shall proceed to a consideration of the evidence, which we think differs very radically from the evidence in any of the other companion cases.

On the question of conspiracy, there was no direct evidence tending to prove any express or implied agreement or conspiracy to commit the fraud charged in the overt acts. There is no evidence of any conversations between any of the defendants with reference to the conduct of the election, indicating that the defendants jointly had any design, purpose, or intent to miscount, alter, or make false return of the votes cast; in fact, a number of the defendants were strangers to each other. On the question of conspiracy we must, therefore, look to the surrounding facts and circumstances.

The defendants Cartello, McKinney, Brown, and Duncan were election officials. The defendant Schmidt was a Democratic precinct challenger or captain, and, as such, entitled to be present during the conduct of the election, but having no official duty in connection therewith. There were also present as election officials Mary Lemon, Democratic judge, who in fact acted as clerk, Ella Lynch, Democratic clerk, and besides these there were present and participating in the conduct of the election to a greater or less extent, Arthur Schmidt, Democratic precinct captain, Floyd Brown, Republican precinct captain, Mr. Sheller, Republican party watcher, Mr. Bedsworth, Republican challenger, and Mr. Perrine, police officer. The ballots, poll books, and tally sheets were presumptively under the control and in the possession of the election officers. When they were produced for examination by the grand jury, it was discovered that thirty or forty ballots cast as straight Republican ballots had been altered by erasures and changed to straight Democratic ballots. The ex-

pert produced by the government spent six days in his examination of these ballots. Some of the erasures could be detected on careful examination, others required special lights, microscopic equipment, and careful scrutiny. The expert testified that three different persons had made various groups of the disputed X marks placed on the Democratic ballots. There was no evidence that either of these defendants made these marks, although the government had possession of the individual ballots cast by each defendant on election day. There was no evidence that comparison of these marks identified any one of the defendants with any one of the claimed three persons marking the ballots. The defendants were fingerprinted, but none of their fingerprints were found on any of these ballots in such position as to indicate that they had made the erasures or the new marks; in fact, the only fingerprint testified to was at the bottom of one of the ballots which corresponded to the fingerprint of the defendant Brown, but as it was the duty of the judges to handle the ballots, this isolated fingerprint had no probative force, and it was so recognized by the trial judge and he so advised the jury. So much for the physical facts.

Other circumstances must be examined and considered. Whatever erasures or alterations were made in the ballots must have been made after the polls were closed and the ballot boxes opened, because it appears from the undisputed proof that the balloting proceeded during the day without incident or irregularities. There were two classes of ballots, those referred to as bond and amendment ballots and the political ballots. When the polls closed, all the ballots were removed from the ballot boxes and deposited on two tables. The amendment and bond ballots were separated from the political ballots. Then the political ballots were separated into Republican and Democratic ballots. Schmidt, not being an officer, took no part in the counting, except that he at times repeated the announcement made by the judge for the benefit of the clerks, but this was in the hearing of all the parties and was a service rendered only when the judge did not speak loud enough for the clerk to hear. There is no proof that the ballots were in fact miscounted. There was no evidence that he misstated the announcement or misled the clerk. While the political ballots were being segregated, certain of the defendants were engaged in counting the bond and amendment ballots. During the entire time of the counting of the ballots, no one of the defendants left his respective position, or went out of the room. Persons other than the defendants were congregated about the polling place during the count and on occasion left and returned.

When first counted, the number of political ballots did not correspond with the record, there being fewer ballots than the poll books indicated as having been cast. After several recounts, the count of the ballots and the poll books agreed, and thereupon the election returns were tallied by the clerks, and all the officers, including the judges and clerks, certified thereto. The tables, two in number, used by the clerks and judges, provided the only flat surfaces in the polling place upon which erasures could have been made.

Aside from these circumstances, the government placed upon the witness stand Mary Lemon and Ella Lynch, both of whom were present during the entire time of the counting of the ballots and acted as clerks of election. The witness Lynch testified that, "All the defendants were under the observation constantly of me or Mrs. Lemon, or both of us. Taking the period up to the time the polls closed at seven o'clock, I saw nothing of any character that was improper. I saw nothing of any character done by the defendants that was improper." She further testified that after the ballot boxes were opened and the ballots removed therefrom, "All five defendants were under my constant observation. The tables were under my constant observation. * * * There was not at any time that evening that I noticed anything on the part of these defendants that was improper."

Mrs. Lemon testified that although she was constantly present and the defendants were under her observation, she at no time saw "any person erasing or changing any ballot." She further testified, "During the day or night, I neither saw or knew of any one of the defendants doing anything of an improper character."

Neither of these witnesses testified to any facts or circumstances incriminating either of the defendants.

Aside from this testimony of the two witnesses for the government, which certainly did not tend to prove guilt on behalf of any of the defendants, the evidence is purely circumstantial. To sustain conviction, it must not only have been consistent

with the defendants' guilt, but must have been inconsistent with their innocence. Tingle v. United States (C.C.A.8) 38 F.2d 573; Langer v. United States (C.C.A.8) 76 F.2d 817; Ribaste v. United States (C.C.A. 8) 44 F.2d 21; Gold v. United States (C.C.A.8) 36 F.2d 16.

We again advert to the fact that aside from the evidence in support of the overt acts, there is no evidence tending to show a conspiracy among these defendants. In the absence of such proof, proof sufficient to connect one of the defendants with the erasures and alterations on these ballots would, of course, be wholly insufficient to warrant a wholesale conviction of the other defendants. A conspiracy is the gist of the offense, and that conspiracy must be proven beyond a reasonable doubt, either by direct or circumstantial evidence, or both. Langer v. United States (C.C.A.) 76 F.2d 817; Dahly v. United States (C.C.A.8) 50 F.2d 37; Tingle v. United States (C.C.A.8) 38 F.2d 573, 575. As said by us in Tingle v. United States, supra:

"But in conspiracy cases, the unlawful combination, confederacy, and agreement between two or more persons, that is, the conspiracy itself, is the gist of the action, and is the corpus delicti charged. It is, therefore, primarily essential to establish the existence of a confederation or agreement between two or more persons before a conviction for conspiracy to commit an offense against the United States can be sustained."

It is argued that these ballots could have been erased in the very presence of the government witnesses Lemon and Lynch without their knowledge, but the evidence is to the contrary and convictions cannot be sustained on mere possibilities. Had these witnesses, with personal knowledge, not been placed upon the witness stand by the government, there might be some room for suspicion or surmise that this had been done, but the government has itself proven that although the ballots were altered, they were not altered by either of the defendants at this polling place. Ordinarily, a litigant is bound by the testimony of his own witnesses, especially if that testimony is uncontradicted and there is no claim of mistake. Wiget v. Becker (C.C.A.8) 84 F.2d 706; Gold v. United States (C.C.A.8) 36 F. 2d 16; Yellow Cab Co. v. Rodgers (C.C.A.3) 61 F.2d 729; Jacobson v. Hahn (C.C.A.2) 88 F.2d 433, 435. In the last-cited case the court said:

"Having called these witnesses to whose testimony we have referred, the defendants may not now successfully question their statements and ask us to reject them as untruthful or unworthy of belief upon mere suspicion that the money was loaned to Flegenheimer."

In the first place, the expert testimony shows that the marks were made by three different individuals, none of whom are identified as the defendants, and government witnesses Lemon and Lynch, who were personally present, positively negative the inference that these ballots were changed there by any of the defendants. To be sure, the physical facts, considered in connection with the expert testimony, show that the ballots were in fact changed by erasure and alteration, but this comes far from showing that these defendants were guilty of making such changes. The most that can be said of this testimony is that it may arouse suspicion and proves a mystery which, however, it does not solve. It would seem entirely probable at least that some one or more of these defendants may have had knowledge of the making of these erasures and alterations. It seems entirely possible that these thirty or forty ballots may have been surreptitiously removed from the pile of straight Republican ballots, taken from the polling place, and altered or changed so as to show that they were straight Democratic ballots, and then returned and placed in the pile of Democratic ballots. This might explain the fact that when first counted there were not as many political ballots as the record indicated had been cast, though by later recount the number of ballots agreed with the record. But who did this is certainly not proved by either direct or circumstantial evidence. It may well have been accomplished with the knowledge of any one of the defendants conniving with one of the numerous parties who apparently came and went during the counting of these ballots.

No conspiracy having been proved, the testimony is wholly insufficient to establish the guilt of the defendants of the crime charged in the indictment, and the motions for a directed verdict should therefore have been sustained. The judgments appealed from are reversed and the causes remanded with directions to grant defendants a new trial.