**PEVELY DAIRY CO. v. UNITED STATES.**

**ST. LOUIS DAIRY CO. v. UNITED STATES.**

Nos. 13789, 13790.

United States Court of Appeals
Eighth Circuit.

Dec. 13, 1949.

Jacob M. Lashly, St. Louis, Mo. (Arthur V. Lashly, Paul B. Rava, and Lashly, Lashly, Miller & Clifford, St. Louis, Mo., on the brief), for appellant St. Louis Dairy Co.

Wm. H. Allen, St. Louis, Mo., and James A. Finch, Cape Gerandeau, Mo. (E. C. Hartman, St. Louis, Mo., on the brief), for appellant Pevely Dairy Co.

Walter D. Murphy, and John R. Niesley, Washington D. C., Special Attorneys, Department of Justice (George B. Haddock, Special Assistant to the Attorney General, Herbert A. Bergson, Assistant Attorney General, and Drake Watson, United States Attorney, St. Louis, Mo., on the brief), for appellee.

Before GARDNER, Chief Judge, and THOMAS and RIDDICK, Circuit Judges.

GARDNER, Chief Judge.

Appellants, Pevely Dairy Company and St. Louis Dairy Company, were convicted for engaging in a conspiracy to fix wholesale and retail milk prices on Grade A regular milk in the St. Louis area, within the State of Missouri, in violation of Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. A. § 1. These two dairy companies, sometimes referred to in the record as handlers, were indicted with six individuals who were

officers or employees of the dairy companies. The indictment charged that the corporate defendants, as handlers, sold and distributed approximately 63 per cent of the fluid milk consumed in the St. Louis area, and that for a period of approximately ten years prior to the return of the indictment the defendants had engaged in an unlawful conspiracy to fix uniform and noncompetitive retail and wholesale prices of fluid milk; that the conspiracy consisted of an agreement and concert of action in that the corporate defendants would charge uniform and non-competitive retail and wholesale prices for fluid milk and that neither corporate defendant would make any change in price until an agreement had been reached that the other corporate defendant would make an identical change; that the corporate defendants on the several dates set out in the indictment, covering a period from July 3, 1946, to January 27, 1948 (which period, by supplemental bill of particulars, was extended to include changes in April, 1942, and June 30, 1946, and seven other such changes between April, 1938 and April 1, 1942), fixed uniform prices for fluid milk, both at wholesale and at retail; that the result of the conspiracy was to increase, stabilize and otherwise control and fix prices to consumers throughout the St. Louis area of milk produced in the States of Illinois and Missouri and shipped into the St. Louis area, and to suppress competition between the corporate defendants; that more than one-half of the fluid milk sold by the corporate defendants in the St. Louis area was produced in the State of Illinois and shipped into the St. Louis area; that fluid milk is perishable by nature, can not be stored, and must reach the consumer within a short time after production, and that from day to day there is a continuous flow of milk from producers in the States of Illinois and Missouri to retail and wholesale purchasers in the St. Louis area.

The corporate defendants, as well as the individual defendants, filed motions to dismiss on the ground that the indictment did not charge an offense under the laws of the United States, and particularly under Section 1 of the Sherman Anti-Trust Act, in that the restraints alleged were in intrastate commerce because the raw milk came to rest and was intermingled in Missouri before the corporate defendants processed and converted it into Grade A milk, and that the indictment failed to charge that the alleged price control constituted a direct and substantial burden upon interstate commerce. These motions to dismiss were overruled. The defendants filed motions for a bill of particulars which the court in part sustained, and in the bill of particulars furnished by the government it was recited that the government had no direct evidence of an express written or oral agreement among the defendants but that it would rely upon evidence from which an oral agreement might be implied.

Their motions to dismiss having been overruled, all defendants entered pleas of not guilty. At the conclusion of the government's evidence, and again at the conclusion of all the testimony, the defendants interposed motions for judgment of acquittal. The ruling of the court on these motions was reserved. The jury returned a verdict of guilty as to the corporate defendants and acquitted all the individual defendants. Subsequent to the verdict the corporate defendants filed their motions for judgment of acquittal notwithstanding the verdict or in the alternative for a new trial, which motions were overruled by the court and the corporate defendants were adjudged guilty and sentenced to pay fines of $5,000 each.

The Pevely Dairy Company and the St. Louis Dairy Company are the largest milk distributors in the St. Louis area. They are engaged in the selling of fluid milk, butter, eggs and various milk products in the City of St. Louis. There are approximately thirty-five dairies which sell milk products in this marketing area. The two corporate defendants handle approximately 63 per cent of the fluid milk in the St. Louis area. This milk was delivered by producers to the dairies in St. Louis by the producers' trucks or by independent truckers employed by the producers and the price paid by the dairies was an f. o. b. price at their plants in St. Louis, and any milk which did not meet the requirements of the St.

Louis milk ordinance was rejected and remained the property of the producers. When the milk was received at the plants of the dairy companies at St. Louis it was inspected, cooled, pasteurized, bottled and capped before it was ready for sale and delivery. Further facts will be developed in the course of this opinion.

The appellants have taken separate appeals but their appeals have been submitted upon a single record and will be considered in one opinion. Reversal is sought on substantially the following grounds: (1) The indictment fails to charge a conspiracy in violation of the Sherman Anti-Trust Act in that the alleged restraints were in intrastate commerce because the raw milk transported from Illinois came to rest, was intermingled with milk produced in Missouri, processed and converted into Grade A milk before it was sold, and in that the indictment charges that appellants were regulating milk prices wholly in the State of Missouri, and fails to allege that such alleged price control constituted a direct and substantial burden upon interstate commerce. (2) The government's testimony was insufficient to sustain a conviction for conspiracy, the evidence being wholly circumstantial and being as consistent with innocence as with guilt; and hence, the motions for acquittal at the close of the government's case should have been sustained. (3) The court erred in the admission of certain evidence. (4) The individual defendants who were the agents of the appellants and the immediate actors in the alleged conspiracy having been acquitted by the jury, the verdict of guilty as to appellants can not stand.

The Sherman Anti-Trust Act, so far as here material, reads as follows: "Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *. Every person who shall make any contract or engage in any combination or conspiracy [hereby] declared * * * illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000 or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

■ Appellants in effect urge two grounds for their attack on the indictment. It is urged that the alleged restraint and conspiracy has to do only with the distribution of milk in the State of Missouri, and hence, this being an intrastate transaction, is not the subject of congressional control. All the acts charged against the appellants were alleged to have been committed within the State of Missouri. The indictment charged, however, that the alleged conspiracy "has had the effect, as intended by the defendants, of increasing, stabilizing, and otherwise controlling and fixing prices to consumers and other purchasers of fluid milk sold by the corporate defendants throughout the St. Louis area of fluid milk produced in the States of Illinois and Missouri and shipped from said States into said area, and of suppressing competition between the defendants * * * and has had the effect thereby of restraining the hereinbefore described interstate trade and commerce in fluid milk." The indictment, in prior paragraphs, charged that the fluid milk sold and distributed in St. Louis was produced in the States of Illinois and Missouri and that the milk produced in Illinois was transported into St. Louis. The mere fact that the alleged conspiracy had to do solely with acts to be performed in the State of Missouri and was limited to the matter of the distribution of milk and the fixing of prices within the State of Missouri, is not necessarily determinative of the issue. If intrastate transactions affect interstate commerce they may properly be the subject of federal legislation. Swift & Company v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 69 S.Ct. 714; Standard Oil Company of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051. In United States v. Women's Sportswear Mfg. Ass'n, supra, it is, among other things, said [336 U.S. 460, 69 S.Ct. 716], "The trial court appears to have dismissed the case chiefly on the ground that the accused Association and its members were

not themselves engaged in interstate commerce. This may or may not be the nature of their operation considered alone, but it does not matter. Restraints, to be effective, do not have to be applied all along the line of movement of interstate commerce. The source of the restraint may be intrastate, * * * as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

Under the Sherman Anti-Trust Act a combination formed for the purpose and with the effect of fixing the price of a commodity in interstate or foreign commerce is illegal per se. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. We must now accept the doctrine as well established that Congress, in enacting the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, intended to exercise its full constitutional power with respect to restraints on commercial competition. Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 52 S. Ct. 607, 76 L.Ed. 1204; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440.

We think the indictment sufficiently charged that the effect of the alleged conspiracy was to restrain or stifle interstate commerce and that the trial court had jurisdiction of the offense charged, unless, as contended by the appellants, the milk, when it came to rest for the purpose of being processed and prepared for distribution by the appellants, lost its character as a commodity of interstate commerce.

On this phase of the case it is the contention of the government that the sales by appellants occurred in the course of interstate commerce because the flow of fluid milk from producers in Illinois remained in interstate commerce until it reached the ultimate consumer and that the course of interstate commerce was not interrupted by the temporary stoppage which would not essentially obstruct or delay such flow.

Fluid milk is a perishable commodity which can not be stored as can ordinary merchandise. It is essential that the milk as transported from Illinois and received by appellants be sold and delivered each day and this was the manifest usage and course of business of the appellants. It was within the contemplation of the parties that the milk should continue its course until delivered by the handlers to consumers in the St. Louis area. As said by the Supreme Court in Swift & Company v. United States, supra [196 U.S. 375, 25 S. Ct. 280], "commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business." The flow of milk until delivered by the distributors to the consumers in the St. Louis area, as charged in the indictment, establishes its interstate character. It was the expectation of both the producers and the handlers that the milk would be shipped in interstate commerce and we are of the view that the fluid milk thus shipped in interstate commerce remained in that commerce until it reached the ultimate consumers. Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; United States v. South-Eastern Underwriters Ass'n, supra; White Bear Theater Corp. v. State Theater Corp., 8 Cir., 129 F.2d 600. In Binderup v. Pathe Exchange, supra, the court said [263 U.S. 291, 44 S. Ct. 99], "The general rule is that where transportation has acquired an interstate character 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.'"

We think the indictment sufficiently charged an offense under the Sherman Anti-Trust Act and that the court committed no error in denying apellants' motions to dismiss.

It is next contended by appellants that conceding that the indictment charges an offense of which the trial court had jurisdiction, the evidence failed to prove that they were guilty thereof, and hence, their motions for judgment of acquittal

should have been sustained. This will necessitate a further survey of the evidence.

It is conceded that the evidence was wholly circumstantial and it is undisputed. The court instructed the jury as to the applicable rule relative to the degree of proof necessary to warrant a conviction where, as here, the evidence is wholly circumstantial. These instructions were not excepted to by appellants, and hence, became the law of the case. We accept them as our guide in considering the question of the sufficiency of the evidence not only because they became the law of the case but because we think they are correct. The court, after advising the jury that there were two kinds of evidence, direct and circumstantial, said,

"In order to justify a jury in finding a verdict of guilty based entirely upon circumstantial evidence, the facts must not only be consistent with the guilt of the defendants, and each of the defendants, but they must be inconsistent with any other reasonable hypothesis that can be predicated upon the evidence. Stated another way, not only must each fact relied upon to show guilt be proved beyond a reasonable doubt, but such fact must be consistent with all other facts introduced in a chain of circumstances, and such facts must further be inconsistent with any other rational conclusion than that of guilt of the defendants.

"As I have said, the guilt of the defendants—and this applies to each of the defendants—can be shown by circumstantial evidence alone and whether the guilt of the defendants, and each of them, has been so established is for you to determine. Where circumstantial evidence is relied upon to establish the conspiracy or any other essential facts, it is not only necessary that all the circumstances concur to show the existence of such conspiracy and facts sought to be proved, but such circumstantial evidence must be inconsistent with any other rational conclusion."

The establishments of these appellants were located near each other in the St. Louis area. They both handled the same products, the price of which as delivered to them was fixed by government regulation. The quality of the milk for each was determined by ordinance of the City of St. Louis and all milk proffered to them which did not under test meet with the requirements of the ordinance was rejected. The cost of labor in processing the milk was determined by contracts with labor unions, so that the cost to each appellant was at all times substantially the same. Appellants were competitors and served substantially the same area and the product as processed was therefore a standardized product. It appears without dispute that the increases in the price of milk charged by the appellants was somewhat less than the increase in the cost of purchasing and processing the product. The circumstantial evidence relied upon as sustaining the verdict consists of the uniformity of the prices charged by the appellants for Grade A regular fluid milk sold by them, and the proximity in time of the price changes listed in the indictment and bill of particulars. In addition, the government showed certain conversations between two employees of the companies concerning price announcements for the period August, 1939 to August, 1941. The last of these conversations, it will be observed, occurred some seven years before the filing of the indictment. It appears from the undisputed evidence that the matter of price changes was thoroughly and analytically considered by the management of appellants, consisting of certain of their officers, at regular meetings, at which the economic factors bearing upon costs were ascertained, scrutinized and discussed, and that the changes made occurred only after a complete evaluation of the economic conditions and factors going into the cost of production. The evidence is to the effect that these factors were the only considerations influencing the price changes. It also appears that this system of determining prices was in accord with a system established by the International Association of Milk Dealers and which had been adopted by appellants prior to the return of the indictment. The details of the process of collecting the data pertinent to the cost of production would not seem to be here material because all this evidence is undisputed and the integrity of the cost account-

ing and allocation system used by appellants and the correctness of the conclusion reached is not challenged by any direct evidence. For each of the price changes charged in the indictment or set out in the bill of particulars detailed evidence was furnished concerning the economic reasons for each price change. For example, on April 8, 1938, there was a reduction of 1¢ a quart which resulted from the fact that the milk producers reduced the price that the appellants were required to pay. On August 7, 1939, there was an increase of 2¢ which was necessary to offset the loss on Grade A milk and to meet the increase of labor costs following a new industry-wide labor contract concluded in August. On February 9, 1940, there was an increase of ½¢ to meet increased labor costs resulting from the revamping of wage scales and overtime compensation paid in compliance with the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. On December 1, 1940, there was an increase of ½¢ necessitated by the increase in the producers price ordered by the Secretary of Agriculture. On July 1, 1941, there was an increase of 1¢ which corresponded to a further increase in the price required to be paid the producers. On July 4, 1946, there was an increase of 1¢ necessitated by a .9¢ increased cost per quart resulting from a new labor contract. On October 5, 1946, an increase of 2¢ was made to offset a 2.1¢ increase in the price to be paid the producers. These details are simply typical and an examination of the record shows that each increase which is specifically charged either in the indictment or in the bill of particulars is rationally explained and accounted for and shown to have resulted from economic conditions which increased the cost of processing and distributing, and, as before suggested, this evidence is wholly without contradiction.

The milk as handled by appellants was a standardized product. Its cost items being substantially identical for both appellants, uniformity in price would result from economic forces. Economists called as expert witnesses testified that in a market such as the fluid milk market in St. Louis, where there were standardized major cost factors, uniformity of price is to be expected. Thus, the Director of Dairy Marketing for the Illinois Agricultural Association testified that, "There is a very little difference in the milk of one dairy as to another, standard products as to butter fat tests, bacterial contents and other uniform requirements."

A Professor of Economics at St. Louis University testified as an expert witness as follows: "Speaking of Grade A milk market * * * we have here a highly standardized product, the product of one dealer being the same as the product of another dealer."

As before observed, the cost factors are basically identical for both appellants. An economist testifying as an expert with reference to the sale price of standardized products, said, "I would expect practically uniformity of price, with slight exceptions, and practically simultaneous change in price."

In a recent treatise by Edward H. Chamberlin, Professor of Economics at Harvard University, entitled "The Theory of Monopolistic Competition," it is said, "One of the conditions of the problem must be the complete independence of the two sellers, for obviously, if they combine, there is monopoly. This independence must, however, be interpreted with care, for, in the nature of the case, when there are only two or a few sellers, their fortunes are not independent. There can be no actual, or tacit, agreement—that is all. Each is forced by the situation itself to take into account the policy of his rival in determining his own, and this can not be construed as a 'tacit agreement' between the two."

In an article entitled "Collusion," appearing in the December, 1948, issue of "Farm Economics," published by the Department of Agricultural Economics of the New York State College of Agriculture, appears the following: "There is nothing peculiar in the fact that a change in the price of wheat or cotton occurs simultaneously in all markets. If the price of No. 1 Northern Spring Wheat in Minneapolis rises 5 cents a bushel, it advances 5 cents in Baltimore, 5 cents in Buffalo, 5 cents in Chicago, and 5 cents in

all the small towns in Minnesota, North Dakota and Montana. These prices not only all advance by the same amount, but they advance on the same day. This is as it should be. There is no collusion. Under the free enterprise system, competition forces all handlers to pay the same price."

These economic principles must of necessity be recognized by the courts. Thus, in Cement Manufacturers' Protective Association v. United States, 268 U.S. 588, 45 S.Ct. 586, 592, 69 L.Ed. 1104, the Supreme Court reversed a judgment granting an injunction for alleged violation of the Sherman Anti-Trust Act. In the course of that opinion Justice Stone speaking for the court, among other things, said:

" * * * the fact is that any change in quotation of price to dealers, promptly becomes well known in the trade through reports of salesmen, agents, and dealers of various manufacturers. It appears to be undisputed that there were frequent changes in price and uniformity has resulted not from maintaining the price at fixed levels, but from the prompt meeting of changes in prices by competing sellers.

"It is urged by the defendants that such uniformity of price as existed in the trade was due to competition. They offered much evidence tending to show complete independence of judgment and of action of defendants by large expenditures in competitive sales efforts and by variations in the volume of their production and shipment, earnings and profits. A great volume of testimony was also given by distinguished economists in support of the thesis that in the case of a standardized product sold wholesale to fully informed professional buyers as were the dealers in cement, uniformity of price will inevitably result from active, free and unrestrained competition, and the government in its brief concedes that 'undoubtedly the price of cement would approach uniformity in a normal market in the absence of all combinations between the manufacturers.'"

In United States v. Standard Oil Company, D.C., 47 F.2d 288, 316, referring to what inferences may fairly be drawn from circumstances, we said, "While it is not the subject of direct evidence, yet it is fairly inferable from the situation shown by the evidence that, if the major companies follow the Socony prices in this area, they do so because they do not wish to engage in a price-cutting war which might entail losses to all concerned (including Socony) without any compensating benefits. Such a view has no sinister aspect, but is merely a matter of business judgment and prudence illustrated in every community in the country by retail competitors in all lines."

We are clear that mere uniformity of prices in the sale of a standardized commodity such as milk is not in itself evidence of a violation of the Sherman Anti-Trust Act. It is to be observed too that the price changes in question were not simultaneous. Neither were the changes uniformly initiated by the same appellant. When a change was made by one of the appellants a like change was made by the other in a few days following. It is conceded that there was no direct proof of any agreement between the appellants for the fixing of prices. In fact, the evidence is undisputed that every price change was made, not as the result of any understanding or agreement, but because of economic factors, and the same economic factors prompting a change by one of the appellants were equally applicable to the other.

There was evidence that prior to October 1, 1942, Mr. Wasser, an employee of Pevely Dairy Company, and Mr. Gee, an officer of the St. Louis Dairy Company, both having to do with sales, exchanged information as to prices which had already been fixed and were about to become effective. These witnesses were called by the government. Neither of them had any power of authority to fix prices and the information given was not with reference to any purpose to fix prices in the future but with reference to prices which had already been fixed. No such practice was followed by appellants during the seven years immediately preceding the finding of this indictment. The evidence is undisputed that they did not make any agreement with reference to the fixing of prices and it is equally undisputed that they did not communicate the knowledge of the changes determined upon by reason of any agreement between the

dairy companies. This testimony, we think, forms no basis for a legitimate inference of the making of or participation in any sort of a conspiracy for the fixing of prices. Inferences which are contrary to established facts may not be drawn from mere conjecture and an unwillingness to believe the unimpeached and uncontradicted testimony of witnesses. Inferences are not themselves evidence but are the result of evidence and are based upon circumstances to take the place of actual proof. When, however, substantial proof is made contrary to the fact inferred, the inference is completely refuted. As said by us in Cartello v. United States, 8 Cir., 93 F.2d 412, 414, speaking of circumstantial evidence, "To sustain conviction, it must not only have been consistent with the defendants' guilt, but must have been inconsistent with their innocence."

In Wesson v. United States, 8 Cir., 172 F.2d 931, 933, in reversing a conviction based upon circumstantial evidence, we said, "Inferences must be based upon proven facts or facts of which judicial notice must be taken and one inference cannot be based upon another inference. To sustain a finding of fact the circumstances proven must lead to the conclusion with reasonable certainty and must be of such probative force as to create the basis for a legal inference and not mere suspicion. Circumstantial evidence, even in a civil case, is not sufficient to establish a conclusion where the circumstances are merely consistent with such conclusion or where they give equal support to inconsistent conclusions. Adair v. Reorganization Investment Co., 8 Cir., 125 F.2d 901; Southern R. Co. v. Stewart, 8 Cir., 119 F.2d 85; Hoskins v. United States, 8 Cir., 120 F.2d 464; Massachusetts Protective Ass'n v. Mouber, 8 Cir., 110 F.2d 203. In Read v. United States, 8 Cir., 42 F.2d 636, 638, which was a criminal case, this court, in an opinion by the late Judge Kenyon, said: 'The law applicable to the first proposition (the question of the sufficiency of the evidence) is well settled in this circuit. In Salinger v. United States, 8 Cir., 23 F.2d 48, 52, this court said: "Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and, where all the evidence is as consistent with innocence as with guilt, it is the duty of this court to reverse a judgment against the accused." ' "

In passing it should be observed that while the indictment charges a continuing conspiracy during a period of ten years, the fact is that during some three years of this alleged ten year period the prices which appellants were permitted to charge were fixed by the government. Instead of being a continuous period of ten years there were two separate periods. These conversations between representatives of the appellants all took place during the first period and it would seem that the three years during which the government fixed prices entirely destroyed the continuity of the period alleged. Whatever may have happened during this first period, being thus separated from what happened during the second period, would, ordinarily, if charged as a separate offense, be barred by the three-year statute of limitations, and the evidence with reference to the conversations between these representatives, if admissible at all, could have but little bearing upon the course of conduct during the second period covered by the indictment. United States v. Great Western Sugar Co., D.C., 39 F.2d 152; In re United Shoe Machinery Corp., D.C.Mass., 73 F.Supp. 207, at page 211; Patterson v. United States, 8 Cir., 222 F. 599, at page 627.

In this connection we note that all individual defendants were found not guilty. The appellants here are corporations. They could act only through officers and agents, yet the only officers and agents who could possibly have committed the violations charged were acquitted. It is true the question on review is not whether the verdict of acquittal of the individual defendants was warranted, but whether the verdict of guilty as against the corporations is sustained by substantial evidence, and mere inconsistency in verdicts is not fatal. However, the verdict of not guilty as to the individual defendants in this case certainly stripped the verdict of guilty as

to the corporation defendants of all semblance of logic or reason, and to our minds weakened the presumption of correctness usually attributable to the verdict of a jury. As said by us in Wesson v. United States, supra [172 F.2d 936],

"Certainly, the proven circumstances were as consistent with innocence as they were with guilt, and inferences may not be drawn from inferences. * * *

"The circumstances as they stand out in the record are consistent with the direct, uncontradicted and unimpeached testimony of the defendant and his witness. Mere suspicion raised by the circumstances proved would not sustain a conviction, especially when such suspicion is removed by uncontradicted evidence."

The circumstances relied upon in the instant case can not reasonably be said to be inconsistent with the innocence of the appellants. We are of the view that the proven circumstances, considered in a light most favorable to the government, are not inconsistent with the innocence of appellants, and hence, their motions for acquittal should have been sustained.

While our conclusion on this phase of the case necessitates a reversal, there remains for consideration the ruling of the court on appellants' objections to the introduction of certain evidence. As this matter may again be presented on new trial we refer briefly to it here. Over objection of appellant St. Louis Dairy Company, the government was permitted to show that all of its stock was owned by the National Dairy Products Corporation of New York. The government also offered proof as to the salary or compensation paid the officers of appellants who were defendants. We think the admission of this class of testimony was erroneous, and in a case where the evidence is purely circumstantial and at best weak, the admission of such testimony was, we think, prejudicial and would require a reversal of this case. Union Electric Light & Power Co. v. Snyder Estate Co., 8 Cir., 65 F.2d 297; Braatelien et al. v. United States, 8 Cir., 147 F.2d 888; O'Hara v. Lamb Const. Co., Mo.App., 197 S.W. 163. In Union Electric Light & Power Co. v. Snyder Estate Co., supra, which was a civil case, counsel for defendant questioned a witness relative to the ownership of the stock of the plaintiff. Referring to the admission of that evidence, we said [65 F.2d 302],

"This cross-examination impressed upon the jury the size and extent of the holdings of plaintiff, the foreign character of the controlling factors of plaintiff, and that the ownership of substantially all the stock of plaintiff was in the North American Edison Company. .* * *

" * * * These extraneous facts, if they are facts, served only to arouse the prejudice of the jury. * * *

"This evidence not only took the jury far from the simple issue to be tried, but it distracted their attention from that issue, and brought before them the size and wealth of plaintiff and its affiliates, and the above-quoted argument of defendants' counsel was calculated to keep fresh in the minds of the jury the size and wealth and foreign character of the plaintiff."

It is noted too that in the instant case the government attorney, in his closing argument, called the jury's attention to the fact that, "There is no evidence but I presume there were dividends paid to the National Dairy Corporation." This was a direct reference to the ownership of the stock of one of the appellants by this foreign corporation. It was certainly not pertinent to any of the issues and could have had but one purpose and that was to prejudice the jury.

The judgments appealed from are therefore reversed and the cause remanded with directions to grant appellants a new trial.

THOMAS, Circuit Judge (dissenting in part).

█ I agree with Judge Gardner that the indictment charges an offense under the Sherman Act, but I do not agree with the conclusions reached upon the other issues in the case. I, therefore, dissent.

RIDDICK, Circuit Judge (dissenting in part).

█ I agree that the evidence wholly fails to establish any agreement between the defendants to fix the price of fluid milk sold to consumers or any concerted action to suppress competition between them in the sale and distribution of fluid milk in St. Louis. This, of course, requires reversal of the judgment below. But I am also of the opinion that the Government's action should be dismissed because the so-called current or flow of fluid milk in interstate commerce from producers in Illinois ended at the processing plants of the defendants.

The fluid milk which reached defendants' processing plants in St. Louis was raw milk. Its sale by the defendants to their customers in St. Louis was prohibited by the St. Louis Milk Ordinance. That portion of the raw milk from Illinois which failed to pass the inspection required by the St. Louis Milk Ordinance remained the property of the Illinois producer. The portion of it which met the test of inspection was commingled with inspected milk produced in Missouri, and, after the processing required by local law for its sale in St. Louis, was held exclusively for distribution to purchasers in St. Louis. Neither the Illinois shippers nor the defendants could have intended that the interstate transportation of the raw milk should proceed beyond defendants' processing plants since its further progress was prohibited by local law. And since the defendants processed the raw milk in various forms, including several kinds of fluid milk as well as butter, ice cream, and powdered milk, no producer in Illinois could have intended that milk shipped to one of the defendants in St. Louis would continue in commerce to the ultimate consumer as Grade A pasteurized fluid milk. The mere fact that defendants, because of the perishable character of fluid milk, were compelled to process and distribute that part of the raw milk received from Illinois which finally reached the St. Louis consumer in fluid form with all possible speed is not, in my opinion, sufficient to establish the interstate commerce in milk charged in the indictment.