ARKANSAS FUEL OIL COMPANY ET AL V.
STATE OF TEXAS

No. A-4758. Decided June 15, 1955.
Rehearing overruled July 27, 1955.
(280 S.W. 2d Series 723-

*Binion, Rice & Cook, Cecil N. Cook,* of Houston, *H. C. Walker, Jr., Robert Roberts, Jr.,* of Shreveport, La., and *Carey K. West, Jr.,* of Fort Worth, for Arkansas Fuel Oil Company; *R. O. Mason,* of Bartlesville, Okla., and *Cecil C. Cammack,* of Ft. Worth, for Cities Service Oil Co., *Lloyd F. Thanhouser, Harry G. Dippel, Ward T. Jones* and *Burney Braly,* all of Houston, for Continental Oil Co.; *Ireland Graves,* of Austin and *H. C. Manning* and *Archie D. Gray,* of Pittsburgh, Pa., for Gulf Oil Corp.; *Ben H. Powell,* of Austin, *Rex G. Baker, Nelson Jones* and *David T. Sears,* of Houston, for Humble Oil & Refining Co.; *Earl A. Brown, Chas. B. Wallace,* of Dallas, and *Dan Moody,* of Austin, for Magnolia Petroleum Co.; *Looney, Clark & Moorhead,* and *Everett L. Looney,* of Austin, *Burges, Scott, Rasberry & Hulse, J. F. Hulse* and *Louis A. Scott,* of El Paso, for Standard Oil Company of Texas; *Cantey, Hanger, Johnson, Scarborough & Gooch, Gillis A. Johnson, Warren Scarborough, Carlisle Cravens, Charles L. Stephens,* and *Sloan Blair,* all of Ft. Worth, *V. R. Tomlinson,* of New York City, and *Coleman Gay,* of Austin, for Sinclair Refining Co.; *Walter L. Barnes,* of Bartlesville, Okla., and *E. H. Foster,* of Amarillo, for Phillips Petroleum Co., *Black & Stayton, Charles L. Black,* of Austin, *John C. Jackson, Robert J. Derby, Wm. E. Loose,* and *S. A. L. Morgan,* of Houston, for Texas Company; all petitioners.

The Court of Civil Appeals erred in holding that the amended petition states a cause of action because it is based upon the theory that uniformity in prices or price increases is sufficient to establish an agreement or conspiracy in violation of the antitrust statutes of Texas, and in holding that the acts of petitioners in adopting and participating in the "Code of Practices for marketing and refining of petroleum products" showed motive, intent and a general scheme on the part of the defendants (petitioners in the Supreme Court). Ford Motor Co. v. State, 142 Texas 5, 175 S.W. 2d 230; Perren v. Baker Hotel of Dallas,

228 S.W. 2d 311; Green v. Texas & Pac. Ry. Co., 125 Texas 168, 81 S.W. 2d 669.

*John Ben Shepperd,* Attorney General, *Robert S. Trotti, W. Hugh Lyerly, Willis E. Gresham, John Reeves, Burnell Waldrep,* Assistants Attorney General, for respondent.

In response to points of petitioners cite C-O-Two Fire Equipment Co. v. United States, 197 Fed. 2d 489; American Tobacco Co. v. United States, 328 U.S. 781, 90 L. Ed. 1575, 66 Sup. Ct.; 1125; Waters Pierce Oil Co. v. State of Texas, 312 U.S. 86, 85 L. Ed. 598, 61 Sup. Ct. 518.

MR. JUSTICE WILSON delivered the opinion of the Court.

This is an antitrust case brought by the State under Title 126, V.A.C.S., and Section 26, Art. 1, Texas Constitution, for injunction and for penalties provided by Art. 7436, V.A.C.S., against our petitioners as defendants.

The various defendants filed a great many special exceptions to the State's petition. After an extensive hearing the trial court sustained all special exceptions. The State declined to amend further and the trial court dismissed the cause.

This left the State's petition bare and placed a Herculean appellate task upon it which it met by grouping the various special exceptions under points of error. Under its first point of error in the Court of Civil Appeals, the State asserted that its petition considered as a whole stated a cause of action. Under nineteen other points it took up the special exception to each major section of its petition. The first point of error had to be good before the other points became material.

The Court of Civil Appeals, 268 S.W. 2d 311, reversed and remanded and held that none of the special exceptions were good. We granted error on two points assigned here which are:

"Point 3. The Court of Civil Appeals erred in holding that the amended petition states a cause of action because it is based on the theory that uniformity in prices or price increases is sufficient to establish an agreement or conspiracy in violation of the Antitrust Laws of Texas."

"Point 5: The Court of Civil Appeals erred in holding that it was proper to allege the adoption of and participation in the 1928 'Code of Practices for the Marketing and Refining of Pe-

troleum Products' as showing intent, motive, knowledge and a general scheme on the part of defendants, because: (i) plaintiff has never contended that such code was material for these purposes or that such purposes are an issue in this case; (ii) there are no allegations in the amended petition establishing a connection between the '1928 Code' and the alleged '1946 conspiracy'; and (iii) the defendants who were parties to the 1928 Code were previously tried and acquitted for the alleged conspiracy based thereon."

Although the trial court entered its judgment on the pleading, the case as presented to us is not confined to the sufficiency of the pleading. Counsel for the State has voluntarily stated that the State has specifically plead all of its evidence. Under Texas pleading a petition should allege the ultimate facts constituting the elements of the cause of action relied upon, but it need not be evidentiary. In general, counsel can, if he wishes, say nothing in advance about the evidence he intends to offer to prove the allegation of his petition. Usually he lets the court and his opposition learn the nature of his evidence as he develops it during the trial. Here the State did not folow that procedure but has announced in open court and in its pleadings and briefs that it has plead its case in great detail and has, in effect, plead its evidence. Probably the State adopted this course in order to obtain a legal test of its evidence comparable to that usually obtained either by motion for summary judgment on affidavit or motion for instructed verdict at the end of the evidence. Therefore the defendants insist that even if they be wrong in maintaining that the State's petition does not, under the rules of pleading, state a cause of action, still they would be entitled to an instructed verdict at the end of the State's evidence, and there is no point in going through a prolonged trial if it must necessarily end in an instructed verdict. This is an unusual procedure but since both parties have presented the case on that basis we will so treat it.

The essence of the offense charged is an agreement to combine capital, skill, and acts for the following purposes:

1. To create and tending to create and carry out restrictions in the pursuit of the business of marketing gasoline within the State of Texas.

2. To fix, maintain, and increase the tank wagon price of gasoline within the State of Texas.

3. To prevent and lessen competition in the manufacturing, refining, and marketing of gasoline within the State of Texas.

4. To fix and maintain a standard or figure whereby the tank wagon price of gasoline marketed within this State is affected, controlled, and established.

■ ■ Since the antitrust laws are penal, the word *combination* as used in Art. 7426, V.A.C.S., means an intentional combination reached by agreement and consent and does not mean a situation thrust upon an accused to which he did not consent or agree. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., U.S. 98 L. Ed. 273, 74 Sup. Ct. 257. Intent to violate is still a bedrock requirement of any penal law. Of course intent may be proved by circumstantial evidence, but the final judgment must be bottomed upon a finding of specific acts done intentionally for an illegal purpose.

The State's position is well stated in the following excerpt from its brief in the Court of Civil Appeals:

"The State's cause of action is predicated primarily upon the existence of identical tank wagon prices, the uniform and simultaneous price increases, and the substantially identical business practices adopted by all the defendants. In addition thereto, and as complementary circumstances which both manifest the existence of the unlawful combination and conspiracy and have made possible its effective operation, the State has alleged a number of activities of the defendants from which it contends that a finding of conspiracy and combination is the only reasonable conclusion. These additional facts and circumstances, among others alleged in the petition, comprise the following:

"1. A mutual participation in the activities of the same trade associations, and more particularly, in the activities of the American Petroleum Institute, which has enabled the defendants to adopt a policy of close cooperation among those engaged in the gasoline marketing industry; and that through such participation, financial contributions, and individual representation on the various boards and committees, each defendant has exchanged ideas, information and suggestions which have resulted in the development of substantial uniformity of action with respect to marketing policies and procedures on tank wagon gasoline sales within this State.

"2. A background of knowledge and experience gained from the participation in the rules and practices of a previous agreement and similar pricing system, which had been adopted and observed for the purpose of eliminating or curtailing unrestricted competition in the oil industry, and from which knowl-

edge and experience gained the defendants were enabled to place into effective operation the uniform and noncompetitive prices at the tank wagon level.

"3. A participation in a program to standardize the three grades of gasoline marketed by defendants, thus making it easier to establish and maintain uniform and non-competitive tank wagon prices.

"4. A practice of engaging in exchanges of gasoline with each other, and the subsequent marketing of such exchanged gasoline under the trade and brand name of the recipient defendant, which suggests a mutual interest and close cooperation with each other and which indicates a mutual deprivation of a natural competitive advantage by reason of the geographical location of the refineries and the variation in transportation costs in transporting the product from the refineries to points of sale.

"5. A concerted effort to maintain uniform and non-competitive crude oil prices, which aided and assisted in the successful maintenance of uniform and identical tank wagon prices, since such action insured the desired and fixed spread between the cost of crude oil, from which the gasoline is produced, and the price of refined gasoline.

"6. A control and domination of a large percentage of the total business in the manufacturing, refining, marketing and retailing industry in Texas, by reason of which dominant position defendants were afforded an opportunity and ability to achieve and to maintain an agreed pricing structure at the tank wagon level.

"7. A number of factors indicative of the artificiality of the tank wagon prices, including the maintenance of higher tank wagon prices (than?) in other states which are more distant from the production of crude oil and the refineries located in Texas; the maintenance of uniform tank wagon prices in Texas despite the fact that the costs of manufacturing and marketing gasoline varies as among each defendant; and the fact that the fixed and agreed tank wagon prices were not justified by the costs of doing business or other economic conditions."

The Assistant Attorney General in oral argument quite candidly stated that he has plead all the facts that he expects to and can prove. The petition does plead the evidence, and, if anything "has the fault not of vagueness and indefiniteness, but of a too detailed pleading of evidence, a fault, however, which does not affect the validity of the indictment." United States v.

New York Great A & P Company, 137 F. 2d 450 (C.C.A., 5th, 1943, cert. den. 320 U.S. 783). In oral argument he stated that he would allege and prove the existence of the alleged illegal agreement only as an inference which he contends flows from the following circumstances:

1. Mutual participation in trade association.
2. Background of knowledge and experienced gained from previous pricing systems.
3. Standardizing of gasoline.
4. Exchange of gasoline.
5. Maintenance of uniform crude oil prices.
6. Maintenance of uniform prices on tank wagon gasoline.
7. Control of 90% of the retail outlet.
8. Control of 80% of the business of marketing gasoline.
9. Control of 65% of the refining business.
10. Increase of net profits over the costs of doing business during the existence of the conspiracy.
11. Higher tank wagon prices in Texas than in other areas more distant from source of production.

Items 2, 10, and 11 are not acts of defendants. So the State's charge may be boiled down to the following activities:

(a) Trade association membership.
(b) Standardization of gasoline.
(c) Exchanges of gasoline.
(d) Uniform crude oil prices.
(e) Uniform tank wagon gasoline prices.

These activities must be put against a background of:

(a) Experience gained under Federal Price Control and the 1928 Code.
(b) Control of 65% of refining and 90% of the retail outlet.
(c) Increase of net profits.
(d) Higher prices in Texas than in other areas.

Participation in trade associations, chambers of commerce, and technical and professional organizations is a characteristic of the American business system. The trade association involved here is the American Petroleum Institute which the State alleges to be composed of men and firms engaged in the oil business in the United States, Canada, and Mexico. This association was not made a party to this case and this is not a suit to dissolve it or prohibit membership in it.

The "background of knowledge and experience gained from previous pricing systems" (Item 2) refers in part to the period when the oil business was under federal pricing during the late world war. This "background" is not something in itself for which the defendant can be or should be punished and is not something which can be affected by or changed by any judgment the court might enter. It is not really an element in proving intent. The relevancy of evidence dealing with Federal Price Control is doubtful since it was imposed as a matter of low. Guilt cannot come from obedience to law.

■ The State controls Items 7, 8 and 9 by selecting the parties defendant. It made ten large companies defendants here. The word *monopoly* loses much of its meaning when applied to a market in which there are ten or more competitors. It could have alleged control of 95% of the retail outlets by naming additional parties defendant and thus increasing the percentage. But what then would constitute a violation? In all probability there are oil companies not parties to this suit which belong to trade associations, standardize and exchange gasoline, and post uniform prices. By naming more oil companies doing the same things as charged against these defendants the percentages in Items 7, 8 and 9 could be increased. A monopoly does not result from simply naming as defendants all of the firms in a field of business endeavor if there be in fact a number of them. We cannot make the violation of a penal statute dependent upon the grouping selected by the State and the State does not allege that the defendants are the only oil companies doing the acts charged. Such an alleged conspiracy has no definite boundaries. We do not mean to say that proof of a conspiracy depends upon naming as defendants all parties to it. We do hold that the allegation of fact with which the State seeks to raise a prima facie case of conspiracy must fix some boundaries to the conspiracy so that definite legal tests can be formulated for determining who should be a party defendant.

Viewed in this light, the State's case comes down to alleging that the defendants associate and meet together (along with nondefendants) and thus have the opportunity to agree on prices; that the defendants practice a standardization and exchange of products (along with nondefendants) ; that the defendants post uniform prices (along with nondefendants) ; and that there existed during the time of the alleged conspiracy an artificially high and noncompetitive price.

The allegation that the sales price of gasoline is artificially

high can be supported by evidence developing a comparison with prices in other states. One of the State's specific allegations on the price in Texas compared with other states is found in paragraphs B, C, and D of Section VIII of the petition (Trans. pp. 95 through 98). The pertinent parts are:

"These defendants herein or their parent, affiliates, or subsidiaries have since on or about July 29, 1946, maintained higher tank wagon prices on gasoline in the State of Texas than in other states which are more distant from the production of crude oil and the defendants' refineries in the State of Texas.

* * *"

* * * * *

"During the period of time from on or about July 29, 1946, to the date of filing this petition, the tank wagon price on regular gasoline, exclusive of all State and Federal taxes, was maintained by one or more of these defendants as herein named, or their parent, affiliates or subsidiaries as herein named, at various points in the above mentioned states as follows:

"1. Louisiana: From three tenths (.3) to nine tenths (.9) of one cent (1c) per gallon lower than in Texas.

"2. Maryland: From two tenths (.2) to eight tenths (.8) of one cent (1c) per gallon lower than in Texas.

"3. District of Columbia: Up to four tenths (.4) of one cent (1c) per gallon lower than in Texas.

"4. New Jersey: From one tenth (.1) to seven tenths (.7) of one cent (1c) per gallon lower than in Texas.

"5. Virginia: From three tenths (.3) to nine tenths (.9) of one cent (1c) per gallon lower than in Texas.

"6. Maine: Up to three tenths (.3) of one cent (1c) per gallon lower than in Texas.

"7. Massachusetts: Up to four tenths (.4) of one cent (1c) per gallon lower than in Texas.

"8. New York: From two tenths (.2) to five tenths (.5) of one cent (1c) per gallon lower than in Texas.

"9. Rhode Island: Up to four tenths (.4) of one cent (1c) per gallon lower than in Texas.

"10. North Carolina: From three tenths (.3) to five tenths (.5) of one cent (1c) per gallon lower than in Texas."

The State's petition does not aver that the prices in the other states are the result of free marketing conditions, that the operating conditions of selling in the other states are substantially similar, or that but for the alleged agreement the prices in Texas would have equaled those listed in other states.

In the absence of allegations that the price offered for comparison is the result of a freely competitive market and that the costs and other factors are substantially the same as in Texas, this would not prove an artificial price.

The following portion of the State's first point of error in its Court of Civil Appeals' brief gives its main contention:

" * * * the existence of an agreement in an antitrust suit need not be established by evidence showing the exact time, place, terms and names of the persons present when the conspiracy was made and entered into, but the existence of such agreement and the purport thereof may be inferred from the acts and conduct of the parties involved; that a conspiracy and combination to violate the antitrust laws is provable by circumstantial evidence; that allegations and proof of the acts and conduct of the parties which lead to no other hypothesis than the existence of a combination and conspiracy in violation of the antitrust laws are sufficient to state a cause of action; that the scope, operation and effect of the conspiracy and combination are fully pleaded with the certainty and particularity required in a suit for penalties and for injunction under the antitrust laws; that each of the acts and conduct of the defendants as set out in the petition is a relevant and material circumstance which both manifests the existence of the conspiracy and has made possible its effective operation; that all of the acts and conduct of the defendants as alleged in the petition when considered in their entirety, reflect with certainty the existence and operation of an unlawful antitrust conspiracy and combination to lessen competition in the the marketing of gasoline in the State of Texas by fixing and maintaining identical and noncompetitive prices on tank wagon gasoline sales in this State; * * * ."

So on the record which reaches us we must first determine whether the items listed above if proved would establish a combination and conspiracy.

In reply to the State's first point copied above the defendants say:

" * * * the only facts alleged in the petition are to the effect

that the prices of defendants have been substantially identical over a period of years, that defendants belong to trade associations, that gasoline is a standardized product and that defendants exchange gasoline. The existence of a 'combination' or 'agreement and conspiracy,' which is the crux of this cause of action, cannot be found in the allegations of fact but must be inferred. The trial court again refused to accept an economic theory in lieu of allegations of fact, and sustained defendants' special exceptions. * * *"

* * *

"Plaintiff's only attempt to negative that the prices complained of were the normal results of competition appears in Paragraph VIII of the petition, where plaintiff alleges the conclusions that these prices 'are in part artificial and are not the result of competition and are not justified by economic conditions,' and 'were not justified by increases in the cost of doing business during the same period of time.' "

Thus we are confronted with the perennial legal puzzle of causation. Do uniform prices result from competition. Or can they result only from an agreement?

Question of causation such as proximate cause are normally treated as questions of fact unless reasonable minds cannot differ. Here we have a very complex economic question which might be treated as a fact question to be proved by expert opinion and other evidence if that were the true ultimate issue. But a uniform price as such is not the true ultimate issue.

The main current of our business system seems to encourage the standardization of basic products. The mass production of standardized competitive products has become a part of the American business system and the life of our citizenry. The grading of such products as milk, fruit, and cotton cannot be done until uniform standards are established. Many products, such as milk, are required by law to meet certain standard grading tests.

Uniform prices are not condemned by the antitrust act. The State does not allege a factual situation comparable to that in American Tobacco Co. v. U. S., 328 U. S. 781, 90 L. Ed. 1575, 66 Sup. Ct. 1125, where each of the big three tobacco buying companies determined in advance what percentage of the total crop they would buy and the maximum prices they would pay.

In Pevely Dairy Co. v. United States, 178 F. 2d 363 (8th Cir. 1949), cert. denied, 339 U.S. 942 (1950) the Court said:

"We are clear that mere uniformity of prices in the sale of a standardized commodity such as milk is not in itself evidence of a violation of the Sherman Antitrust Act."

This is a correct statement of the law. The true issue is whether an artificially high or low uniform sales price was set and maintained (or an artificial purchasing price for crude) by agreement. Cement Mfgrs. Protective Association v. U.S., 268 588, 69 L. Ed. 1104. It would serve no purpose to have an economic marketing expert testify that in his opinion the practices listed in the State's position would always achieve uniform prices. In order to make a case, the State would have to prove that, even so, the retail price for gasoline in the absence of an illegal agreement fixing a specific price in fact differed from that figure when based upon costs, demand, and other factors. An essential element of the State's case is that under free marketing conditions (i.e., minus the alleged agreement) the price should be a lesser or greater figure than it actually is. It should be alleged in the case at bar that since the uniform price is in fact higher than it should be, the actual sales price is artificially high by reason of the illegal agreement. And the agreement must be to fix prices. An agreement to do acts which are themselves legal and which result in a uniform price arrived at by the free working of competition is not enough. So the establishment of an artificial sales price as a fact is a necessary element in making a circumstantial evidence case of an antitrust conspiracy to fix the sales price of gasoline.

A standard grading procedure may necessarily, under the pressure of competition, produce standard retail prices throughout the State. In this connection, the State alleges:

" * * * All of the defendants market gasoline in Texas at the same price regardless of their refinery locations; because those of the defendants who do have local refineries are failing, and have at all times material hereto failed and refused (because of mutual understanding existing among themselves) to exploit the natural competitive advantages resulting from the geographical location of their particular refineries."

This condition is alleged to be in part brought about by the system of exchanges. The State alleges:

" * * * In this connection plaintiff alleges that the defendants

knew, and have known at all times material hereto, that it would be easier on their part to reach their agreed goal of uniform tank wagon prices on gasoline if gasoline were standardized and so considered as among themselves, than if gasoline were not standardized, and that such knowledge motivated the activities of the defendants with reference to the standardization of gasoline."

The exchange of standardization gasoline in order to reduce the cost of hauling, storing, and handling may be good business if it does in fact reduce costs. It is not prohibited by law.

■ As a practical matter, the only thing which can be enjoined is an illegal agreement. The State says it has no direct proof of an agreement but must prove it by circumstantial evidence.

Normally circumstantial evidence is a test to be applied at the end of the evidence and is not a test to be applied to a pleading. However, the heart of the State's case lies in proof sustaining the allegations that during the period involved the prices were noncompetitive and artificial.

■ According to the oral argument of the Assistant Attorney General he expects to prove an artificial price structure through proof of trade association membership, standardization of gasoline, exchange of gasoline, and uniform crude oil and tank wagon gasoline prices plus the background material he alleges. We hold that as a matter of law this will not establish an artificial price structure. It is unnecessary to pass upon the legal effect of the general allegations of his petition. There is no point in burdening the trial court with a prolonged trial which must end in an instructed verdict. Accordingly, the judgment of the Court of Civil Appeals is reversed and the judgment if dismissal of the trial court is affirmed.

Opinion delivered June 15, 1955.

Rehearing overruled July 27, 1955.