**Jerry Irving BLOOM, Petitioner,**

v.

**TEXAS STATE BOARD OF PHARMACY,
Respondent.**

**No. A–10431.**

Supreme Court of Texas.

March 10, 1965.

Rehearing Denied April 21, 1965.

Wynne, Jaffe & Tinsley, Dallas, Parker & Williams, Irving, for petitioner.

Waggoner Carr, Atty. Gen., Austin, J. C. Davis and Paul Phy, Asst. Attys. Gen., for respondent.

SMITH, Justice.

The Respondent, The Texas State Board of Pharmacy, after notice and hearing on the 19th day of April, 1963, found Jerry Irving Bloom, a registered pharmacist, guilty[1] of the charge of violating Article 4542a, Section 12(h), Vernon's Annotated Statutes. Section 12(h) provides that the Pharmacy Board may in its discretion cancel, revoke or suspend the license of any pharmacist if the Pharmacy Board finds after hearing that a licensee has engaged in the act of "substitution" in the dispensing of drugs. The Act defines "substitution" as meaning " * * * the dispensing of a drug or a brand of drug other than that which is ordered or prescribed without the express consent of the orderer or pre-

---

1. "On the *17th* day of *April, 1963*, came on to be heard the complaint filed with the Texas State Board of Pharmacy, charging you with the offense of violating Article 4542a, Revised Civil Statutes of Texas, Section *12* and *(h)*, Sub-section —— and ——; And the Texas State Board of Pharmacy having heard the evidence and testimony in regards to the above charges and complaints, and after due deliberation thereon, did find you the said *JERRY IRVING BLOOM* guilty as charged; And it was accordingly ordered by the Texas State Board of Pharmacy

that: Your pharmacist's certificate #11253 be suspended for three (3) years and all but the first sixty (60) days of said suspension be placed on probation under the condition that no violation occurs during the three (3) year period of suspension. Upon the receipt of this notice you will return your certificate No. 11253 and your renewal license #3540 to the Board's office. At the end of 'sixty (60) days, the certificate and renewal will be returned to you."

scriber." Section 12(h) goes further to provide that:

"If the consent of the orderer or prescriber for substitution by the licensee is obtained, a notation shall be made by the licensee on the prescription stating that such consent has been obtained and by whom such consent was given, and such notation shall, in addition, specify the drug or brand of drug so substituted."

On May 3, 1963, Bloom filed in the District Court of Dallas County, his appeal from the Pharmacy Board's order suspending his pharmacist's certificate. The petition alleged that the Pharmacy Board's findings were not reasonably supported by substantial evidence, and that the evidence wholly failed to establish a violation of the law as charged; that the action of the Pharmacy Board was arbitrary, illegal, invalid and of no effect in that the order was not only without support in substantial evidence, but to the contrary the evidence showed that he had not violated the law, as charged; that he "had acted in good faith, had no intention to violate any law or regulation governing Plaintiff's conduct as a registered pharmacist and that there was no basis for any complaint against the Plaintiff." There is no contention that the druggist was negligent in any respect or that he filled the prescription by mistake.

On May 3, 1963, the trial court entered a temporary restraining order without notice to the Pharmacy Board based upon Bloom's verified application therefor, restraining and enjoining the Pharmacy Board from enforcing its April 19, 1963, order.

On May 10, 1963, the Court, after considering Bloom's pleadings, the Pharmacy Board's general denial and the evidence offered by both parties, granted a Writ of Injunction decreeing that the Temporary Restraining Order entered on May 3, 1963, be "continued in force and effect as a Temporary Injunction" pending final hearing of the cause.

On August 26, 1963, after a hearing of the cause on its merits, the trial court rendered its judgment granting a permanent injunction in favor of Bloom and against the Pharmacy Board, holding that the Pharmacy Board's order was not reasonably supported by substantial evidence and was invalid. The trial court ordered that "the Defendant Texas State Board of Pharmacy, its servants, agents and/or employees be, and they are hereby, restrained and enjoined from enforcing or carrying out its order of April 19, 1963, and from suspending, revoking or cancelling Plaintiff's certificate and license to practice pharmacy, * * *."

The Pharmacy Board, on appeal to the Court of Civil Appeals for the Fifth Supreme Judicial District of Texas, won from that Court a judgment reinstating its order of April 19, 1963, and dissolving the permanent injunction which had been granted by the trial court on August 26, 1963. 382 S.W.2d 496.

We reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

The facts are undisputed. Bloom dispensed a substance in two small bottles to a representative of A. H. Robins Company by pouring said substance from a one-gallon container, Bloom's Exhibit 5, bearing the A. H. Robins Company "Donnatal" label. The one-gallon "Donnatal" container had been purchased by Bloom's employer from a wholesale drug house; Bloom had never tampered with, or altered the contents of the Donnatal container; Bloom had no reason to believe that the bottle contained anything other than Donnatal; and Bloom believed that the substance dispensed was actually Donnatal. In addition to these admitted facts, the Pharmacy Board gives

emphasis to the fact that fifteen [2] tests were made by an A. H. Robins Company chemist in making an analysis of the dispensed substance, and that, in the opinion of the chemist, the substance analyzed was "definitely imitations of Donnatal elixir." The record shows that ten of the fifteen tests showed that the substance analyzed was different from the A. H. Robins Company Donnatal elixir specifications. The chemist admitted that five of the tests "ran the same on the substance that came out of Plaintiff's Exhibit 5, as run on Donnatal." The chemist testified on cross-examination that the A. H. Robins Company did not ship Donnatal directly to the Dorchester Pharmacy, but shipped it to a wholesaler in Dallas, Texas, and that he did not know "what happened to this bottle while it was in the hands of the wholesaler."

The principal contention of Bloom is that the evidence shows conclusively that he did not violate the law in any manner when he filled the prescriptions describing a drug known as "Donnatal." The Pharmacy Board takes the position that the Statute, especially Section 20 [3] of Article 4542a, supra, which provides that the practice of pharmacy in the State of Texas is a professional practice affecting the public health, safety and welfare, does not require intent to violate the Statute, and that the Legislature did not intend to make scienter an element. If intent is not required, then the order is supported by substantial evidence.

The answer to the question turns on our interpretation of the Statute, particularly the meaning intended to be given by the Legislature to the word "substitution" contained in the Statute. We hold that when the Legislature defined the word "substitution" in the Act as meaning " * * * the dispensing of a drug or a brand of drug other than that which is ordered or prescribed without the express consent of the orderer or prescriber," it meant to provide that before a guilty finding will be allowed to stand, the evidence must establish a conscious substitution. We recognize that it is not the province of this Court to substitute itself for the Pharmacy Board in determining the wisdom or advisability of the order in question, but this Court will only sustain the order upon a determination that the Pharmacy Board's conclusions are supported by substantial evidence. In sustaining the judgment of the trial court in this cause, we recognize the rule that the Pharmacy Board's order is presumed to be valid, and the burden rests with Bloom to show that the Pharmacy Board's order of April 19, 1963, is not

---

2. Fourteen of thse tests were: (1) the refractive index test; (2) the specific gravity test; (3) the pH. test; (4) the color absorbency test; (5) the taste test; (6) the odor test; (7) the alcohol test (this test was 22.9 per cent, and was within the specifications for Donnatal elixir); (8) the phenobarbital content test (this test showed 14.0 milligrams per 5 cc's., and this was lower than Robins Company minimum specifications of 15.4 milligrams); (9) the alkaloid test (this test was positive and normal with Donnatal elixir); (10) the optical rotation test; (11) the optical rotation test again after sixty minutes (the first test showed the optical rotation was 23.2 degrees—the second optical rotation test showed the rotation was minus 10.00 degrees. The chemist testified that the lowest for Donnatal would be plus 86 degrees); (12) the fructose test (the sample contained fructose; "this is entirely different from Donnatal elixir"); (13) the reducing sugar test; and (14) the running of a tracer test. Although the chemist testified to making these tests, he admitted that he could not determine what the substance was.

3. "The practice of pharmacy in the State of Texas is declared a professional practice affecting the public health, safety, and welfare and is subject to regulation and control in the public interest. It is further declared to be a matter of public interest and concern that the practice of pharmacy, as defined in this Act, merit and receive the confidence of the public and that only qualified persons be permitted to practice pharmacy in the State of Texas. This Act shall be liberally construed to carry out these objects and purposes."

reasonably supported by substantial evidence. Under our decisions an administrative order is reasonable, as a matter of law, if it is supported by substantial evidence. The evidence in this case shows conclusively that Bloom had no intention to substitute one drug for another. The Pharmacy Board cites Sutherland Statutory Construction, 3rd Edition, Vol. 3, Section 7202,[4] pp. 397–398, in support of its contention that statutes such as this, which are enacted for the protection and preservation of public health, should be liberally construed in order to accomplish their objectives. The Pharmacy Board contends that Bloom has no escape from the force of the Statute, which provides a penalty for the violation, merely because he acted without fault.

We decline to adopt the view expressed by the Pharmacy Board that this Statute "dispenses with the conventional requirement for criminal conduct * * * awareness of some wrongdoing" and that "in the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in relation to a public danger." This was the view expressed in the case of United States v. Dotterweich, (1943) 320 U.S. 277, 281, 64 S.Ct. 134, 136, 88 L.Ed. 48, and adopted by the Court of Civil Appeals in this case. The Pharmacy Board, in urging this court to adopt its view, lifts from the case of United States v. Hohensee, (3 Cir. 1957) 243 F.2d 367, 371, cert. den. 353 U.S. 976, 77

S.Ct. 1058, 1 L.Ed.2d 1136, the statement of the Court that:

> "the Act imposes criminal sanctions as a means of regulating activities so dangerous to the public welfare as not to permit of exception for good faith or ignorance. A person acts at his peril in this field."

In the Hohensee case the defendants were indicted on nine counts for causing the introduction and delivery for introduction into interstate commerce of misbranded drugs contrary to the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, 21 U.S.C. § 321 et seq. Act, 21 U.S.C., defined "labeling" as meaning " * * * all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." "(g) The term drug means * * * (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." The Act prohibited the "introduction or delivery for introduction into interstate commerce of any * * * drug * * * that is adulterated or misbranded." In addition to the label on the drug container, the defendants delivered lectures and distributed printed material dealing with most chronic diseases. The Court in holding that the Act imposes sanctions as a means of regulating "activities so dangerous to the public welfare as not to permit of exception for good faith * * * " was concerned with a different *Act* than involved in the present case, and was dealing with a factual situation reflecting fraud and mis-

4. "Since a very early time the courts have been committed to the doctrine of giving statutes which are enacted for the protection and preservation of public health an extremely liberal construction for the accomplishment of their objectives. The public and social purposes served by such legislation greatly exceed the inconvenience and hardship imposed upon the individual, and therefore the former is given greater emphasis in the problems of interpretation. Therefore the courts are inclined to give health statutes a liberal interpretation despite the fact that such statutes are primarily penal in nature and frequently impose criminal penalties. In most cases the proper enforcement of health laws is dependent upon administrative officers and agencies upon whom the efficacy of such legislation is dependent. While the courts have usually employed a rather rigid interpretation of statutes granting powers to administrative agencies, this rule has notably been relaxed in the interpretation of statutes granting powers to boards having control over public health."

representation of a drug through the use of false and misleading literature. The Court cited the case of Kordel v. United States, (1948) 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52, to support its holding. The Kordel case is factually very similar to the facts in Hohensee. In Kordel the misbranding consisted of statements in circulars or pamphlets distributed "to consumers by the vendors of the products, relating to their efficacy." Kordel supplied the pamphlets as well as the products to the vendors. Of the twenty counts in the information filed against Kordel, seven charged that the drugs and literature were shipped in the same cartons. The literature involved in the other counts was shipped "separately from the drugs and at different times— both before and after the shipments of the drugs with which they were associated." The main issue presented in Kordel was the question of whether the separate shipment of the literature saved the drugs from being misbranded within the meaning of the Act. The Court held that "the phrase 'accompanying such article' is not restricted to labels that are on or in the article or package that is transported." The Kordel case involved the use of false and misleading literature designed for use in the distribution and sale of drugs. Under the record thus presented, the United States Supreme Court affirmed the conviction of Kordel for the offense of introducing or delivering for introduction into interstate commerce misbranded drugs. In both the Hohensee and Kordel cases the judgment of the Court was based on facts showing a fraudulent misrepresentation through the use of false and misleading literature.

It is argued that the absence of the word "knowingly" or the word "intentionally" from the Statute indicates that "the Legislature was declaring the public policy of this State to be that the substitution of one drug or brand of drug for that ordered or prescribed would be sufficient ground for revoking, cancelling or suspending a pharmacist's license, regardless of the good faith or unawareness of wrongdoing on the part of the pharmacist."

The Court of Civil Appeals in adopting this theory and in holding that Bloom should be held guilty, says that such a public policy is quite consistent with that declared by our Supreme Court in Griggs Canning Co. v. Josey, 139 Tex. 623, 164 S.W.2d 835, 840, 142 A.L.R. 1424. This case held that "a retailer who sells unwholesome food for human consumption is liable to the consumer for the consequences under an implied warranty imposed by law as a matter of public policy, even though the food is in sealed containers bearing the label of the manufacturer and the retailer has no means of knowing that the contents are unfit for human consumption." We find no case in this or any other jurisdiction which applies this rule to a factual situation where, as here, all of the evidence establishes a complete unawareness of any wrongdoing. See Whiteley v. Webb's City, 55 So.2d 730 (Fla., 1951); Watkins v. Jacobs Pharmacy Co., 48 Ga.App. 38, 171 S.E. 830 (1933); People's Service Drug Stores v. Somerville, 161 Md. 662, 158 A. 12, 80 A.L.R. 449 (1932).

In the case of Garner v. Texas State Board of Pharmacy, (1957) Tex.Civ.App., 304 S.W.2d 530 (err. ref.), which the Court of Civil Appeals distinguishes, the Board revoked the license of a pharmacist under the authority of Article 4542a, Sec. 12(f), V.A.T.C.S., which says that the Board may revoke such licenses when the holder thereof "directly or indirectly, aids or abets in the practice of pharmacy any person not duly licensed to practice under this Act." The evidence showed that Garner, the pharmacist, did not know that his employer had filled a prescription in his absence, but there was evidence that drugs were missing which Garner never checked. If a pharmacist may be held innocent of this violation in the absence of knowledge which he could have easily obtained, it seems that the petitioner here, who has not more seriously endangered the public by dispensing a drug so much like that ordered that it takes a complete and thorough chemical analysis to tell

the difference, should not be branded as unprofessional for acting as prudently as the circumstances allowed. Thus, it is seen that knowledge was required in Garner. We see no reason why this subsection of the Act under consideration should be construed differently. Since Bloom had no intention to substitute one drug for another, the Pharmacy Board's order is not supported by substantial evidence.

Our decision on the points discussed renders it unnecessary to pass upon Bloom's remaining points of error.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

GRIFFIN, NORVELL and STEAKLEY, JJ., dissenting.

CALVERT, Chief Justice (concurring).

I concur in the judgment entered.

I agree that under a proper construction of the statute, scienter, or knowledge of substitution, is essential to the right of the Board to suspend the license of a licensee.

WALKER, J., joins in this opinion.

NORVELL, Justice (dissenting).

I do not agree with the Court's approach to this case nor the decision herein which in effect reduces the responsibility of a professional pharmacist to that of a mere label reader. This is not a criminal case but one involving a statute designed to protect the public interest by providing for a board of professionals to govern and control the practice of pharmacy. This Court has now re-written a portion of the statute by re-defining the statutory definition of the term "substitution" contained in Article 4542a, § 12(h) by inserting the word "knowingly" therein. This in itself is a substitution of sorts and to my mind runs contrary to the clear intent of the Legislature. It also makes readily available the time honored defense of "I didn't know it was loaded", and runs counter to the experience of the

federal authorities in effecting an efficient control over drugs and foodstuffs. I do not believe that the doctrine of *caveat emptor* should be applied to purchases of processed foodstuffs, drugs and medicines. Surely a professional pharmacist is in a much better position to know the nature and properties of chemicals that go into a prescription than is the patient-consumer. And this is true, no matter how complicated the chemical formula of a drug may be. A duty is owed by any profession to the public which it purports to serve. In my opinion the professional board has fairly discharged the obligations enjoined upon it by law. The penalty assessed by it was neither harsh nor unreasonable. This Court should not interfere with its action.

I am wholly in accord with the able opinion of the Court of Civil Appeals, 382 S.W.2d 496, and hence pretermit further discussion. I respectfully dissent from the order reversing the Court of Civil Appeals.

GRIFFIN and STEAKLEY, JJ., join in this dissent.