The STATE of Texas, Petitioner,

v.

Harry M. HARRINGTON, Jr., et al.,
Respondents.

No. A–10592.

Supreme Court of Texas.

Oct. 12, 1966.

Rehearing Denied Nov. 16, 1966.

See also Tex.Civ.App., 363 S.W.2d 321.

Waggoner Carr, Atty. Gen., Austin, Roger B. Tyler, Jr. and Kerns Taylor, Asst. Attys. Gen., for petitioner.

Gordon Wellborn & Rex Houston, Henderson, Harrington & Harrington, H. M. Harrington, Jr., Longview, for respondents.

SMITH, Justice.

This is a civil suit for penalties. The State of Texas brought the suit under authority of Article 6036,[1] Vernon's Annotated Civil Statutes, alleging that the defendants, Harry M. Harrington, Jr., Reid H. Allgood, Charles W. Lutes, J. W. Baton and Douglas Godfrey had drilled and operated a deviated oil well across their own lease lines in violation of the laws of the State of Texas, and in violation of the rules, regulations and orders of the Railroad Commission of the State of Texas. The Court held as a matter of law that the well was *drilled* during a period of 16 days, and was *operated* in violation of law during a period of 3650 days. Special issues were submitted to a jury and in answer to such issues, the jury found (1) that the well in question was bottomed off the defendants' lease; (2) that a reasonable penalty for each day of the 16 days the well was being drilled was the sum of $800.01. As to this penalty, the jury assessed the sum of $266.67 per day

---

1. "Article 6036

"In addition to being subject to any forfeiture that may be provided for by law and to any penalty that may be imposed by the Commission for contempt for the violation of its rules, regulations, or orders, any person violating any of the provisions of this Act or of Title 102, Revised Civil Statutes of Texas, 1925, as amended, or violating any rule, regulation, or order of the Commission promulgated thereunder, shall be subject to a penalty of not more than One Thousand Dollars ($1,000) for each and every day of such violation, and for each and every act of such violation, to be recovered in any Court of competent jurisdiction in Travis County, or in the county of the residence of the defendant, or, if there be more than one defendant, in the county of the residence of any of them, or in the county in which the violation is alleged to have occurred, such suit by direction of the Commission to be instituted and conducted in the name of the State of Texas by the Attorney General or by the county or district attorney where such suit is brought. The recovery or payment of any such penalty shall not authorize the violation of any provision of this Act, or Title 102, Revised Civil Statutes of Texas, 1925, as amended, or of any rule, regulation, or order of the Commission promulgated thereunder.

"Any person aiding or abetting any other person in the violation of this Act, or of Title 102, Revised Civil Statutes of Texas, 1925, as amended, or of any rule, regulation, or order of the Commission promulgated thereunder, shall be subject to the same penalties as are prescribed herein for violation thereof by any such other person."

against each of the defendants Harrington, Allgood and Lutes, and none against the defendants Baton and Godfrey; and (3) that a reasonable penalty for each of the 3650 days the well was *operated* was the sum of $80.00. In answer to an additional issue, the jury found the amount of the operating penalty per day against each of the defendants to be as follows: Harrington—$31.00; Allgood—$15.50; Lutes—$31.00; Baton—$2.50 and Godfrey—none.

On November 26, 1963, after receiving the verdict and discharging the jury and before any further action by the Court, the State of Texas filed its motion for the admission of additional evidence which was granted over the objection of the defendants, Harrington, Allgood and Lutes. The evidence introduced was from the deposition testimony of Harrington. The evidence was related to the 16-day drilling period. The State contends that this testimony was admissible under Rule 270,[2] Texas Rules of Civil Procedure. The above named defendants contested the motion on the ground that "the amount of days of drilling * * * upon which [judgment] is now sought *be entered* by the plaintiff, is a very controversial matter, and under Rule 270 * * * may not at this time be received by the Court."

On December 12, 1963, the defendant, J. W. Baton, after the Court had received the jury verdict, filed a motion for permission to introduce additional evidence. This motion was granted and evidence was introduced without objection. The State also introduced additional evidence in connection with the evidence introduced by Baton and the defendants; Harrington's, Allgood's and Lutes' objection thereto was overruled. The questions raised because of the late introduction of all of this evidence will be discussed in connection with the State's points of error.

2. "Rule 270. Additional Testimony
"At any time the court may permit additional evidence to be offered where it clearly appears to be necessary to the due

On the 3rd day of January, 1964, the trial court signed and entered its judgment. The decretal portion of the judgment reads as follows:

"It is, therefore, ORDERED, ADJUDGED AND DECREED by the Court, that the State of Texas do have and recover of and from Harry M. Harrington, Jr., the sum of $117,416.72 with interest thereon from the date of judgment until paid at the rate of 6% per annum, that the State of Texas do have and recover of and from Reid H. Allgood the sum of $60,841.72 with interest thereon from the date of judgment until paid at the rate of 6% per annum, that the State of Texas do have and recover of and from Charles W. Lutes the sum of $117,416.72 with interest thereon from the date of judgment until paid at the rate of 6% per annum, and that the State of Texas do have and recover of and from J. W. Baton the sum of $9,125.00 with interest thereon from the date of judgment until paid at the rate of 6% per annum; and that said sums shall be payable to the Treasurer of the State of Texas for the benefit of the General Revenue Fund of the State of Texas; and

"It is also ORDERED, ADJUDGED AND DECREED that all court costs are hereby taxed against the said Harry M. Harrington, Jr., Reid H. Allgood, Charles W. Lutes and J. W. Baton, jointly and severally; and

"It is also ORDERED, ADJUDGED AND DECREED that execution shall issue in the name of the State of Texas for the collection of the judgment herein provided and for all court costs incurred in this case; and

"It is further ORDERED, ADJUDGED AND DECREED that the State of Texas take nothing against

administration of justice. Provided in a jury case no evidence on a controversial matter shall be received after the verdict of the jury."

Douglas Godfrey, and that he be discharged with his costs."

The Court of Civil Appeals affirmed the judgment of the trial court assessing penalties against Harrington, Lutes and Allgood and refusing to assess penalties against Baton and Godfrey for the 16 days drilling period, but in all other respects, the trial court's judgment was reversed and the cause was remanded to the trial court. 385 S.W.2d 411. We reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

We granted the State's application for writ of error primarily to review the action of the Court of Civil Appeals in holding that ."the $80.00 per day penalty found by the jury in Special Issue No. 4[3] for the 3650 days the well was operated would not support the judgment of the trial court for such penalties," and to review the holding that the trial court erred in not defining the word "operated" appearing in Special Issue No. 4. The application of Harrington et al. was granted and is here for review because of the granting of the State's application.

A statement of the pleadings and the facts is essential to a proper understanding of our holding.

### The Pleadings

The State alleged that the defendants were the co-owners of an oil and gas lease[4] on land situated in Wood County, Texas, and were *mining partners* in the drilling, completion and production of oil from a deviated well surfaced on the land described in the lease, but bottomed on adjoining land. The State pleaded elements to estab-

lish a mining partnership, and that the defendants operated under the assumed name of "HAL CO."; that on February 5, 1952, "HAL CO." made application to the Railroad Commission of Texas for a permit to drill an oil well at "a particular location, to-wit, 234 feet South of the North line of said lease and 234 feet East of the West line of said lease." On February 28, 1952, Permit Number 42,688, authorizing the drilling of an oil well was granted. The well was drilled to completion on or about April 21, 1952.

The State further alleged that the defendants made preparations to drill such oil well (to be known as No. 1, Texas Pacific Coal Co. Mineral Fee tract, 20 ac., Charles Duncombe Survey, Hawkins Field, Wood County, Texas), but determined and made plans to drill such well at a location other than the location prescribed in the permit by making the surface location, that is, the mouth of the well, at the location prescribed in the permit, but secretly deviating and slanting the well underneath the surface of the ground in such manner that it would be closer to the west line of the defendants' said lease than authorized by the permit and in such manner that it would cross the south boundary line of said lease, and be secretly bottomed on and under other lands and leases owned by other persons. The State pleaded that the defendants entered into a fraudulent conspiracy among themselves to slant the oil well in a westerly direction and file a false well record, by which it would be represented to the Railroad Commission that said well was drilled straight down within three (3°) degrees of vertical and bottomed on and under the defendants' lease at the location prescribed in the permit, when in truth and in fact said

---

3. "SPECIAL ISSUE NO. 4: What sum of money, if any, do you find from a preponderance of the evidence to be a reasonable penalty for each day of the 3,650 days said well was operated?
   "Answer in dollars and cents, or none.
   "ANSWER: $80.00."

4. "The Oil and Gas Lease involved was executed by Texas and Pacific Oil Company,

Lessor to the Defendants Harrington, Allgood and Lutes. The defendants Baton and Godfrey acquired their respective interests through purchase by assignment from Allgood to Baton, and by assignment of a fractional interest from Baton to Godfrey. The assignment to Baton is dated May 9, 1952, and the assignment to Godfrey is dated January 1, 1953.

well would be deviated and slanted more than thirty (30°) degrees from vertical and bottomed on and under the lands of other persons.

The defendants Harrington, Allgood and Lutes filed a general denial of all the allegations in the State's pleadings and specifically denied under oath that they or either of them were ever partners, or mining partners doing business under the name of "HAL CO."

We make no further reference to the defendant Godfrey since the trial court rendered judgment in his favor and there was no appeal from such action.

### The Undisputed Facts

On February 28, 1952, Permit No. 42,-688 authorizing the drilling of an oil well by "HAL CO." on the Defendants' lease was granted. Drilling of the well began April 6, 1952, and drilling continued through April 21, 1952, a period of 16 days. The documentary evidence established that on April 28, 1952, the well was tested, produced and operated. Railroad Commission Form SW-1, filed with the Commission by the Defendants, signed by J. W. Baton for the "HAL CO.", acknowledged by H. M. Harrington, all on April 28, 1952, and registered and approved by the Railroad Commission on April 30, 1952, shows the producer's certificate of compliance and authorization to transport the well's production from the lease. The E. B. Monthly Production Reports filed by and on behalf of the petitioners and the payments to petitioners by Humbe for the oil production runs show that the wells from and after April 28, 1952, produced a full monthly allowable for the month of May, 1952 and each month thereafter through the month of June, 1962. According to the undisputed testimony of witness Ray Payne, and his compilation report, the well produced a total of 283,133 barrels. The well was unplugged for more than ten (10) years. The well was finally ordered shut down by the Railroad Commission and the pipeline

severed on July 31, 1962. Thus, the State established that the well was producing its allowable for a period of at least 3740 days. However, the State pleaded a penalty for only 3650 days and judgment was entered on that basis. The State's evidence shows that the well was maintained in an operable condition from the day production began on April 30, 1952, until July 31, 1962.

The State's evidence further shows the testimony of Ray Payne, Director of Field Operations for the Railroad Commission, who testified that the so-called "shut-down" or "allowable" orders of the Railroad Commission do not mean or imply that the well is actually shut down or not produced for whatever number of days production is not allowed, but it simply restricts the total production for a month to the number of barrels permitted in terms of so many days allowable; that the well is still legally permitted to produce every day of the month as long as it only produces the total number of barrels allowable expressed in terms of so many days' production; that "the Commission permits the gas-oil ratio surveys to be filed on a calendar basis and the wells to be tested on a calendar basis." The State contends that the "so-called 'shut down' or 'allowable' orders of the Railroad Commission constitute no evidence whatever as to whether the wells were actually produced any number of days, as it is still permissible to produce some oil every day of the month."

### Undisputed Evidence as to Deviated Drilling

The State introduced in evidence Railroad Commission Form 2, the well completion report, which was signed and sworn to by defendant J. W. Baton for the "HAL CO.", before H. M. Harrington, stating that he had "knowledge of the facts and matter herein set forth and that the same are true and correct." Next, the State introduced in evidence Railroad Commission Form 3 filed for "HAL CO." and signed by Baton and Lutes. The last item under "Date of Potential Test" reveals that the well was com-

pleted at 3:15 p. m., April 21, 1952. The State also, after the verdict had been received, but before judgment, introduced Harrington's deposition. His evidence corresponded with the report as to the number of days of actual drilling. However, he did testify that "the date the drilling began might have been as early as April 4."

The State's Exhibit 46 and the testimony of Thomas H. Sellers, Sperry Sun surveyor, showed that the slanted well began its deviation at 100 feet and continued its deviation to the total depth of 5,090 feet, drilling that number of feet in sixteen days, which would result in an average drilling of at least 318 feet per day. The State also introduced an expert witness, Charles Pollard, who testified that in order to drill a slant well like the one in the instant case, it is necessary for a directional driller to prepare plans, charts, schedules and diagrams in advance so that the bottom of the hole can be located at the desired objective. Pollard testified that from a study of the State's Exhibit 45, the well in the instant case was intentionally deviated. The defendants made an attempt to destroy the effectiveness of this testimony through the cross-examination of Pollard. The cross-examination of the witness, Pollard, was conducted by Mr. Harrington, one of the defendants. The defendants claim that Pollard's testimony on cross-examination shows that the deviation *could have been done with one tool, at one time.* It is their contention that such testimony raises an inference at least that the directional drilling could have been limited to one day. We have carefully examined the testimony and find that Pollard did not testify, as claimed. Pollard did testify in answer to a hypothetical question that "one deviation instrument" or "tool" could have been used to deviate the well, but no question was asked as to what length of time would have been required to effect the deviations found in the present case.

The State proved by expert witnesses, Thomas Sellers and Grady Bell, that in July, 1962, after the well was closed down by the Railroad Commission, they made a "directional survey" of the *bore-hole* of the well by the use of accurate instruments and methods, and found that the vertical depth of the well was 4,737.74 feet, that the horizontal displacement of the bottom of the well was 1,664.73 feet in a direction of North 87 degrees 56 minutes West from the surface location of the well, and that the actual length of the *bore-hole* was 5,090 feet. The State further proved by a qualified land surveyor, Ralph Andrews, that the *bore-hole* of the well crossed the property boundary line so that the bottom of the well was in a different tract of land than the surface location authorized by the permit to drill the well. None of the evidence, showing that the well was slanted and bottomed off the lease, was controverted or denied.

Additional evidence will be related later in passing upon various questions presented in the applications for writ of error. The defendants offered no direct evidence. The only evidence introduced by the defendants was that elicited from the witnesses through cross-examination, or by the introduction of parts of the depositions of the defendants, Godfrey, Allgood, and Lutes. Godfrey's deposition had been taken in another case. However, it was stipulated that the deposition could be introduced in evidence in this case since the same lease and well were involved.

### Opinion

Before final disposition of the points presented in the State's application for writ of error, we must rule upon the questions presented in the defendants' application which strike at the very foundation of the State's alleged cause of action. Some of these questions are raised by all of the petitioners and some by Baton alone. Our conclusions hereinafter reached upon each of these questions lead to the final holding that the State of Texas discharged its burden of pleading and proving a penalty action against all of the petitioners as contemplated by Article 6036, supra.

■ Article 6036 is a civil penalty statute enacted for the primary purpose of promoting and encouraging law enforcement and deterring violations of the rules, regulations and orders of the Railroad Commission. The State charged that Rule 37, and related rules, were violated.

### Jurisdiction

■ The defendants assert that the District Court was without jurisdiction of this cause, since direction by the Commission to the Attorney General to file the suit must be made pursuant to a hearing before the Commission of which the defendants had notice and opportunity to be heard. Thus, the defendants are urging that no hearing was held, and therefore this suit must be abated because the State does not have the authority to maintain the suit. We disagree. The defendants rely upon such cases as State v. Crown Central Petroleum Corporation, et al., 369 S.W.2d 458, (Tex. Civ.App., 1963), ref. n. r. e., and Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, to support their contention. These cases are not in point. The controlling statutes there under consideration made it clear that the Commission, or the particular administrative body involved, should first determine and act on the question involved. Upon examination of Article 6036, it is readily apparent that the Legislature has not given the Railroad Commission exclusive original jursidiction, but has explicitly authorized the court to hear the matter in the first instance. The issue involved in this case is one inherently judicial in nature. This Court in Gregg v. Delhi-Taylor Oil Corporation, 162 Tex. 26, 344 S.W.2d 411 (1961), said:

"* * * Where the issue is one inherently judicial in nature * * *, the courts are not ousted from jurisdiction unless the Legislature, by a valid statute, has explicitly granted exclusive jurisdiction to the administrative body."

The Attorney General of Texas has properly brought this suit as the representative of the Railroad Commission of Texas.

### STATE WIDE RULE 37, Rule 54

#### Hawkins Field—Rule 1

We agree with the State that Rule 37 is of state-wide application except as modified by special rules for individual fields. The Court of Civil Appeals has so held. We agree that the state-wide Rule 37 applies to the Hawkins Field, the field in which the well involved is located. Section (a) of the rule provides for spacing distances, application and hearing on exceptions. Section (b) provides for a hearing on exceptions and is a duplication of parts of Section (a). Section (c) provides for the filing of a plat. The following pertinent sections of Rule 37 read as follows:

"Section (d). In the interest of protecting life and for the purpose of preventing waste and preventing the confiscation of property, the Commission reserves the right in particular oil and gas fields to enter special orders increasing or decreasing the minimum distances provided by this rule.

"Section (e). No well drilled in violation of this Rule without special permit obtained, issued or granted in the manner prescribed in said rule, and no well drilled under such special permit or on the Commission's own order which does not conform in all respects to the terms of such permit shall be permitted to produce either oil or gas, and any such well so drilled in violation of said rule, or on the Commission's own order shall be plugged.

"Section (f). This rule shall in no wise rescind, abrogate or modify the provisions of special orders applicable to the spacing of wells in particular fields requiring minimum spacing distances either greater or smaller than provided herein."

■ Hawkins Field Rule 1 Section (a) is identical with Section (a) of State-Wide Rule 37, while Section (b) of Hawkins Field Rule 1 provides that the general order on subdivision of property shall apply.

Rule 37 is a state-wide general rule and the regulatory purpose of the rule is clearly evidenced in Section (e), supra. Any departure from the rule is to be deemed to be in the nature of exceptions, by virtue of special orders, with respect to the spacing of wells. See Railroad Commission of Texas v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942). Provision for exception to the rule as to the spacing of the wells in certain fields, as prescribed by special order, is set out in Section (f), supra, of Rule 37, Hawkins Field Rule 1 (c) is such a particular field and special rule or order. Read in harmony with the general Rule 37, it is clear that Hawkins Field Rule 1 merely requires larger spacing requirements between adjoining wells or property lines. Hawkins Field Rule 1 does not otherwise change, modify or limit the applicability of Rule 37. We note that Hawkins Field Rule 1 has no section comparable to Section (e) in Rule 37. The intention of the Railroad Commission in the adoption of Rule 37 was to outlaw operation and production of all wells drilled in violation of the permit and spacing requirements and to require plugging of all wells so drilled. It was never intended for Hawkins Field Rule 1 to abrogate Rule 37 so as to permit such wells to produce, operate and remain unplugged while at the same time requiring more onerous spacing requirements.

■ The defendants contend that the drilling of a deviated well across their own lease lines is not in violation of any rule of the Railroad Commission. It is argued that Rule 37 only controls the number of wells on a tract and their surface location and does not control the deviation or bottom hole location of wells. The argument is that if any rule controls it is Rule 54, rather than Rule 37. We decline to hold that Rule 54 [6] is the sole rule which controls in determining whether or not the State has a cause of action to recover penalties under Article 6036, supra. The defendants admit that the operation of an unintentionally slanted well drilled in violation of Rule 54 or a "straight hole clause" [7] is an offense. However, the defendants seek to limit the scope of this admission. They contend that knowingly operating an intentionally slanted well drilled prior to April 1, 1949, the effective date of the adoption of Rule 54, and in the absence of a "straight hole clause" is not an offense until there is a valid Commission order finding the well to be in violation of its rule and regulations and directing that the well be shut in. The defendants further argue that under Rule 54, the *unintentional drilling of a slant well* is not an offense; and, that the *intentional drilling of a slant well*, prior to Rule 54 and in the absence of a "straight hole clause" is not an offense. The effect of all of this argument is to say that at no time and under no circumstances has the Railroad Commission, through Rule 37, sought to regulate subsurface drilling. In other words, the defendants contend that Rule 37 does not control bottom hole locations and that Rule 54 was promulgated and use of the "straight hole clauses" in specific Rule permits were adopted in order to cure the "hiatus" in Rule 37. The defendants contend that Rule 54 which requires knowledge and intent is the only rule the State can invoke as a basis for an action for penalties. We do not agree. The

6. Rule 54 provides:
   "(b) Nothing in these rules shall be construed to permit the drilling of any well in such manner as it crosses property lines except in cases where special permission has been granted by the Commission as a result of a hearing on such matter.
   "(c) No well hereafter drilled may be *directionally deviated* from its normal course by any means of deviation before the operator shall have secured a permit for the *directional deviation* of the well from the Railroad Commission. * * * "

7. Starting in 1946, the Commission adopted a policy of inserting "straight hole" clauses in specific Rule Permits where the offset operators requested it. By 1948, the Commission had settled on a standard "straight hole" clause.

question of whether or not, before there can be a penalty assessed, the acts charged must have been committed knowingly and willfully, will be discussed later in this opinion.

■ A further analysis of Rule 37 is necessary. We direct attention to pertinent provisions of the Rule to show that where the rule speaks of a well being drilled at certain locations on a tract, it contemplates not merely drilling from the surface, but the subsurface to its bottom hole location. Section (a) of Rule 37, in part, states:

> "No well for oil or gas shall hereafter be drilled nearer than twelve hundred (1200) feet to any well completed *in or drilling to the same horizon on the same tract or farm.*" (Emphasis added.)

Section (a) of State-wide Rule 37, as amended by Hawkins Field Rule 1, further provides that no well for oil or gas shall hereafter be drilled nearer than a specified number of feet to any property line. Section (3) of State-wide Rule 37 prohibits production from a well "which does not conform in all respects to the terms of such permit." The insertion of "straight hole clauses" into Rule 37 orders is strongly indicative of the intention of the Railroad Commission that Rule 37 should cover subsurface drilling. Thus, it is seen that the Railroad Commission could, under Rule 37, adequately cope with illegal deviation without the necessity of depending upon Rule 54. Rule 54 was adopted primarily for the purpose of providing a procedure for the benefit of those who desire to obtain legal authority to drill in a predetermined direction or course. See Stewart v. Humble Oil Co., 377 S.W.2d 830 (Tex.Sup.Ct., 1964). The rule was never intended to serve as an escape hatch for those who seek to deviate or directionally drill beneath the surface without authority. Early decisions by this Court, among them being Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 938, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393 (1935), render it apparent that the Railroad Commission could not have promulgated and the courts could not have sustained Rule 37 if that rule was limited so as to only regulate surface drilling. When this Court in Brown v. Humble Oil & Refining Co., spoke of injury to adjoining lands, it was not speaking of injury to the surface alone. The Court, in determining the meaning of the rule, recognized that the basic purpose of the rule was the prevention of waste or confiscation. Therefore, the exceptions which are permitted to prevent waste or confiscation would have no meaning if the surface location only, and not the reservoir location, is the test for a legal and valid well location. The Railroad Commission must have control over where the wells are to be located in the reservoir. Of course, the surface location of the well is important only to the extent that the surface position is fixed with some certainty on the lease. See Lippincott v. Atlanta Refining Co., 128 S.W.2d 847, (Tex. Civ.App.1939, error dism., judm. cor.); Atlantic Oil Production Company v. Railroad Commission, 85 S.W.2d 655 (Tex.Civ.App. 1935, error dism.); Stanolind Oil & Gas Co. v. Midas Oil Co., 123 S.W.2d 911 (Tex. Civ.App.1939, error dism.); Trapp v. Atlantic Refining Co., 169 S.W.2d 797 (Tex. Civ.App.1943, error refused). In this latter case the Court held that Rule 37, instead of being indefinite, concerns underground conditions as well as surface locations.

The Defendants argue that the statement in Harrington v. Railroad Commission, supra, that " * * * [d]rilling at an established surface location may be a condition to the right to drill, but drilling a straight hole obviously is not" supports their theory that the drilling or operation of a slant well does not violate Rule 37. The statement is not susceptible of such interpretation when considered in the light of the nature of the suit. In Harrington v. Railroad Commission, 375 S.W.2d 892, (Tex.Sup., 1964), the Court was concerned with the issue of whether or not wrongful deviations operated to work a forfeiture of the rights granted by the permits involved. In passing

upon that question, we were not concerned with the question of liability to a penalty action under Article 6036, since the question of penalties was not before us.

### Mining Partnership

We have carefully examined the evidence bearing upon the question of whether or not the Defendants were engaged in a mining partnership as alleged by the State. We have concluded that a mining partnership as to all Defendants was shown as a matter of law. All of the elements of a mining partnership—joint ownership, joint operations, sharing of profits, community of interest and mutual agency representing the mining partnership in management and operation—were proved without dispute. The record shows that the Defendants acquired their respective property interests from the Texas & Pacific Coal & Oil Company in the fall of 1951. These interests were acquired through a "farm-out" agreement with Texas & Pacific. The rights were originally acquired by a series of transactions conducted by Harrington for himself and in behalf of the other Defendants. The rights and interests acquired were later confirmed by legal conveyances. The record shows that each defendant made admissions conclusively establishing that an oral agreement was entered into before the well was drilled whereby they would own the lease proportionately and would share in the expenses and profits. It is immaterial that conveyances of interests to some of the partners were executed after the well was drilled. There was no written or oral agreement to limit the rights or duties of any one of the defendants so as to preclude liability, responsibility, control, operation or management of the lease. A mining partnership arises by operation of law where co-owners work a mine. See Wagner Supply Co. v. Bateman, 118 Tex. 498, 18 S.W.2d 1052.

The record shows that the defendants operated under the name of "HAL CO." and worked together from a time before the well was drilled until the dissolution of the partnership long after the well was completed. It is not necessary that a mining partnership be created by mutual agreement or intention, or by mutual selection of the persons comprising the partnership. See 12 Tex.Law Review, 410, 412, 413, 414. The cases relied upon by the defendants involve a general partnership and not a mining partnership.

The requisite element for a mining partnership which seems to create the greatest difficulty is joint operation. From our examination of cases in this and other jurisdictions it seems that this element is absolutely required before a mining partnership arises. This element has been conclusively shown. Each defendant worked and cooperated in every act that was done. Harrington secured the lease, handled the "pooling" of money, paid the pooled money out by paying the expenses of operation, including paying the pumper and the driller. Harrington secured the forms and furnished necessary information for Baton to make reports to the Railroad Commission. Baton represented to the Railroad Commission that he was the owner and operator of "HAL CO.". Baton furnished the surface pipe when they started the well. Baton admitted, when testifying after being called under the adverse party rule, that all of the defendants were members of the "HAL CO." at the time the well was drilled; that "we drilled the well, Yes, sir"; and that all of the defendants had an interest in the Company. Baton, Allgood and Lutes, in addition to owning an interest in the farm-out or lease from the beginning, looked to Harrington for progress reports. Lutes admitted Harrington acted for all of the defendants in acquiring the lease and that he looked primarily to Harrington. Baton was active in the mining operation from the start. Baton frequently appeared at Harrington's office and signed all reports which had been prepared by Harrington. The defendants paid their proportionate share of the expenses and received their proportionate share of the income in ac-

cordance with division orders. There is no denial by any of the defendants of these admitted facts. In this case there was no contract between the defendants except their joint oral agreement to drill and operate. Unquestionably, a mining partnership existed at all pertinent times. See Munsey v. Mills & Garrity, 115 Tex. 469, 283 S.W. 754 (1926); Wagner Supply Co. v. Bateman, supra; Clayton v. Bridgeport·Machine Co., 33 S.W.2d 787 (Tex.Civ.App. 1930, error ref.), and 12 Texas Law Rev., 410, for additional authorities.

### Knowledge-Intent

We have heretofore discussed to a limited degree the contention of the defendants that knowledge or intent is a necessary element which must be alleged and proved and that since the State did not so allege, the judgment allowing a recovery of penalties under Article 6036, supra, must fall.

The defendants argue that Article 6036 is purely a penalty statute and depends entirely upon a reference to rules, orders and regulations of the Railroad Commission to define the act, in this case the unlawful deviation of an oil well. It is further argued that neither the statute nor Rule 37 makes any reference to the deviation of a well and that only with the adoption of Rule 54 in 1949 was deviation of an oil well dealt with in the rules of the Railroad Commission.

■ We have concluded that "knowledge" or "intent" is not required to be alleged and proved as a necessary element in a civil penalty action under Article 6036. This article authorizes a civil action for penalties. See Patton v. State, 62 S.W.2d 381 (Tex.Civ.App. 1933, no wr. hist.) and Waters-Pierce Oil Co. v. State, 48 Tex.Civ. App. 162, 106 S.W. 918 (1907, wr. ref.) It is an historical fact that the statute, at various times, has been changed so as to either include or exclude from its provisions the words "knowingly and willfully violating". The 1929 statute did not contain these words. In 1934 the statute was changed so as to contain the words "knowingly and willfully violating" any of the provisions of Act or Title 102; or "knowingly and wilfully violating the terms of any rule, order or regulation of the Railroad Commission of Texas." In 1935, the statute was enacted with substantially the same provisions as formerly, except that the Legislature eliminated the elements of knowledge and intent. The defendants rely upon the case of Bloom v. Texas State Board of Pharmacy, 390 S.W.2d 252 (Tex. Sup. 1965) in support of their contention that a proper construction of Article 6036 leads to a holding that scienter, or knowledge, is essential to the right of the State to a recovery of penalties. The statute involved in Bloom did not have this legislative history whereby the words "knowingly and willfully" had been deleted from the statute. Therefore, knowledge and intent under Article 6036, supra, are immaterial.

### The State's Application

We come now to the questions presented in the State's application for writ of error.

■ We have held that as a matter of law the well was drilled for a period of 16 days. It was not error, therefore, for the court to fail to submit to the jury for its determination an issue as to the number of days the defendants were engaged in drilling the well.

■ The evidence is uncontroverted that the well was illegally operated for more than 3,650 days. The principal argument of the defendants is that the allegations and proof that they maintained the well in an unplugged state for a period of over 3,650 days amounts to no evidence that the well was "operated" for that period of time. In this connection, the Court of Civil Appeals has reversed the judgment of the trial court, holding that the State failed to establish by the uncontroverted evidence that the well was operated in an unplugged manner for 3,650 days, and that the use of the undefined word "operated" in Special Issue No. 4

was error. We disagree with both holdings. The well remained unplugged and continuously ready to produce its allowable. It was maintained in an operable condition and production was regularly obtained therefrom. The defendants contend that "operation" means only "producing". The words "operated" and "produced" are not synonymous. The word "operated", as used in the charge, means everything that is done to maintain an oil well so as not to abandon it. We hold, in this case, that the well was being operated and maintained so as to attain the result appropriate to the nature of the enterprise. See Concordia-Arrow Flying Service v. City of Concordia, 131 Kan. 247, 289 P. 955 (1930); Rogers v. Osborn, 250 S.W.2d 296 (Tex.Civ.App. 1952), reversed on other grounds by this Court, 152 Tex. 540, 261 S.W.2d 311 (1953).

The defendants drilled the well in a deviated manner across a boundary line of their lease. The evidence shows that the well produced its allowable during a period of more than 3,650 days. The well was maintained and operated so that it could produce oil at a moment's notice. The pleadings were sufficient and the evidence introduced thereon is conclusive as to the duration of the operation of the well. See State v. Arkansas Fuel Oil Co., 268 S.W.2d 311, 316, penalty suit, (Tex.Civ.App.1954), reversed on other grounds, 154 Tex. 573, 280 S.W.2d 723 (1955).

The evidence which was heard by the Court after the verdict was received was properly considered since it was evidence on a non-controversial matter. There was no evidence introduced after the verdict which raised a material issue of fact.

The trial court did not define the word "operated" in its charge to the jury. We have examined the defendants' objections and exceptions to the trial court's charge and find that the defendants objected and excepted to "Special Issue No. 4" because of the court's failure to define the word "operated". However, the de-

fendants failed to request in writing and tender to the trial court a definition of the word "operated". Failure to submit a definition under the circumstances was not error. Rule 279, Texas Rules of Civil Procedure. In the case of Yellow Cab and Baggage Company v. Green, 154 Tex. 330, 277 S.W.2d 92, 93 (1955), we held that when "the court's charge contains no instruction, the complaining party must accompany his clear and specific objections to such omission with a substantially correct definition or with explanatory instruction."

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.

Justice GRIFFIN, J., dissenting.

GRIFFIN, Justice (dissenting).

It is my opinion that the Court of Civil Appeals has correctly decided this case and I agree with that opinion. 385 S.W.2d 411.