**CITY OF GALVESTON, Appellant,**

v.

**STATE of Texas, Appellee.**

No. 1086.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

Jan. 8, 1975.

James L. Anthony McLeod, Alexander, Powel & Apffel, Robert V. Shattuck, City Atty., City of Galveston, Galveston, for appellant.

John L. Hill, Atty. Gen., Donald W. Allee, Asst. Atty. Gen., Houston, for appellee.

TUNKS, Chief Justice.

About December 14, 1972, a lift station on a sanitary sewer line in the City of Galveston became inoperative. The City installed a pump to by-pass the lift station. On February 5, 1973, the pump so installed was damaged when it was struck by an automobile. On that date another pump was installed to replace the damaged one. Thereafter residents on the shore of near-by English Bayou detected the odor of sewage in the bayou. After complaints by the residents, personnel of the City and of the State Department of Health, on March 1, 1973, inspected the installation of the by-pass pump. It was discovered that it was improperly installed. The intake line of the pump was connected to a sanitary sewer line above the lift station; but the discharge line was connected below the lift station, not to the sanitary sewer line which would have taken the sewage to a treatment plant, but to a storm sewer line which carried the sewage and discharged it into English Bayou.

The State filed suit against the City to recover civil penalties for the City's violation of Tex.Water Code Ann. § 21.251 (1972) [1], V.T.C.A., by its discharge of sewage into English Bayou. Later, by amendment, the State added its claim for penalties for the City's violation of such statute by failing to complete its chlorination facilities by May 1, 1973, as ordered by the Texas Water Quality Board. (The State also sought certain injunctive relief which was denied by the trial court and which presents no issue in this Court.) The case was tried to a jury. The jury found that the City "caused, suffered, allowed or permitted the discharge of sewage into English Bayou . . ."; that such discharge occurred on twenty-three days; that a penalty of $1,000 a day [2] should be assessed

[1]. § 21.251. Unauthorized Discharges Prohibited.
 (a) Except as authorized by a rule, regulation, permit, or other order issued by the board, or the executive director when authorized by the board, no person may:
 (1) discharge sewage, municipal waste, recreational waste, agricultural waste, or industrial waste into or adjacent to any water in the state; . . .

[2]. § 21.252. Civil Penalty.
 A person who violates any provision of this chapter or any rule, regulation, permit, or

against the City; that the City's failure to complete its chlorination facilities before May 1, 1973, was not authorized by the Texas Water Quality Board; that such facilities were completed on September 26, 1973; and that the penalty assessed against the City for delay in the completion of its chlorination facilities should be $50 per day of such delay. The trial court rendered judgment on that verdict against the City for $30,100. The City has appealed.

The City's first point of error is based upon its contention that the trial court erred in rendering judgment against it for penalties in discharging the sewage into English Bayou because there is no finding that it "knowingly or intentionally" caused such a discharge. The City relies largely upon Bloom v. State Board of Pharmacy, 390 S.W.2d 252 (Tex.Sup.1965), as authority in support of its contention. The State, on the other hand, contends that proof and finding of knowledge and intent on the part of the City is not necessary for recovery of penalties against the City for sewage discharge. The State relies largely upon State v. Harrington, 407 S.W.2d 467 (Tex.Sup.1966), as authority in support of its contention.

The Bloom case involved the Texas State Pharmacy Board's suspension of a pharmacist's certificate. The suspension was pursuant to the terms of Vernon's Tex.Rev.Civ.Stat.Ann. art. 4542a, § 12(h) (1960). That statute permits such a suspension if a pharmacist dispenses a drug or brand of drug other than that which is ordered or prescribed. The language of the statute does not require that such substitution be with knowledge or intent on the part of the pharmacist in order to constitute a ground for suspension. The court held, however, that knowledge or intent of the pharmacist as to the substitution was essential to the Board's power to suspend his certificate.

In the Harrington case, the State sued for the recovery of a civil penalty as provided for in Tex.Rev.Civ.Stat.Ann. art. 6036 (1962). It was alleged that the defendants had drilled and operated a slant hole oil well in violation of the rules and regulations of the Texas Railroad Commission. In that statute there was no language requiring the proof of knowledge or intent on the part of the defendants of the violation of the Commission's rules or regulations as a condition to the recovery of a penalty. The Supreme Court held that allegation and proof of such knowledge or intent were not necessary as elements in the State's cause of action. The Court held that the case was not controlled by its holding in the Bloom case because of the legislative history of Article 6036. Before that statute's amendment in 1935, it had included "knowingly and willfully" as elements of a cause of action under it. By the 1935 amendment the Legislature deleted the words "knowingly and willfully." This fact was construed by the Court as evidencing the legislative intent that knowledge and intent not be necessary elements of a cause of action under the statute.

The history of the Texas Legislature's treatment of water pollution control statutes bears a close similarity to the legislative history of Article 6036, involved in the Harrington case. Texas' former water pollution statute, Article 7621d, Tex.Laws 1961, ch. 42, § 10(a), at 156, made it a misdemeanor, punishable by a fine of from $100 to $1,000 a day, for one to *knowingly* violate its terms. On September 1, 1967, Tex.Laws 1967, ch. 313, at 745, became effective and repealed Article 7621d. The later statute, at section 15(a), imposed civil penalties for its violation and omitted the requirement that the violation be knowingly committed to subject one to those penalties. Again, in 1969, the statute was amended and the civil penalties provision,

other order of the board is subject to a civil penalty of not less than $50 nor more than $1,000 for each act of violation and for each day of violation, to be recovered as provided in this subchapter.

carried forward as section 4.01(d), did not require that the violation be knowingly done. Tex.Laws 1969, Ch. 760, § 1, at 2229. Finally, the statute was amended again, effective September 1, 1971, by enactment of the Texas Water Code. The civil penalty part of the statute became the above quoted section 21.252, which does not, by its literal language, require knowledge on the part of the violator to impose the provided for civil penalties. Also, at Section 21.553, the misdemeanor penalty has been carried forward with the deletion of the "knowingly" requirement that was a part of the statute before 1967.

 The City argues that this legislative history as to the deletion of the "knowingly" element relates only to the misdemeanor penalty provision. There was no civil penalty provision in the water pollution statute before its amendment in 1967. But the statute before and since 1967 dealt with the subject matter of water pollution. The fact that the Legislature before 1967 required knowledge as an element for the imposition of misdemeanor penalties and thereafter has not required such element for the imposition of penalties, either civil or misdemeanor, is persuasive that its intent in the enactment of Section 21.252 was that knowledge or intent to violate not be required for the imposition thereunder of civil penalties. The case of Williams v. State, 514 S.W.2d 772 (Tex.Civ.App.—Beaumont, 1974), also supports our holding that no proof of scienter is necessary for the assessment of penalties against the City.

By its points of error two and three, the City contends that the trial court erred in entering judgment for $23,000 as a penalty for the sewage discharge because the jury's finding that the discharge continued for twenty-three days is not supported by any evidence or is contrary to the great weight and preponderance of the evidence.

In considering the City's no evidence points, we must look only to the evidence in support of the verdict in the light most favorable to the verdict. Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914).

At the trial, the written interrogatories of Owen Holzheuser, City Director of Engineering Services, were read into evidence. He had there stated that some sewage was being pumped from the sanitary sewer system into the storm drainage system either daily or almost daily between December 14, 1972, and March 1, 1973. On the witness stand, Holzheuser partially retracted this answer to the extent that he did not know the exact date that the pump was improperly installed. He did testify that his department had received complaints of noisy operation concerning the lift station. He also stated that on February 5, 1973, he received a complaint that the pump had been hit by a car, and that someone had to go to the scene and replace it with another pump. He further testified that on March 1, 1973, he personally observed that the pump was incorrectly hooked up so that a portion of the sewage was being pumped into a storm drain and ultimately into English Bayou. Stanley W. Thompson, former Regional Engineer of the State Health Department, also testified that he observed the same situation at the inoperative lift station on March 1, 1973. Carroll McClain, Chief Sanitarian Officer for the City of Galveston Health Department, testified that he saw the pump prior to Christmas, 1972, and that on March 1, 1973, it had been movd to a different location. He did not stop to investigate it on the earlier occasion so he could not say whether it was incorrectly hooked up at that time. McClain testified that on March 1, 1973, when investigation was made, he observed that the pump was discharging sanitary sewage into a storm sewer. John Unverferth, former city manager for Galveston, testified that several people had made noise complaints about the lift station during that period from December 1972, to March 1, 1973, but that he never investigated them. He also said that he learned later that the lift station became inoperative in December 1972.

Senator A. R. Schwartz testified that on February 26, 1973, he personally investigated a complaint he had received from friends concerning the lift station. He testified that he could smell untreated sewage at the pump hook-up and at his own home, which was near the outfall point into English Bayou. State and county health department employees responsible for taking and testing water samples in the Galveston area and reporting their findings to the City testified that the fecal coliform count for the English Bayou area during the period from December 1972, to March 1, 1973, was the highest ever recorded. There was also testimony that such a large increase in the coliform count could only be caused by raw sewage.

We hold that from the record before this Court, there is evidence to support the jury's finding that the discharge of sewage into English Bayou continued twenty-three days, from February 5 when the pump was hit by a car and replaced, to March 1, when the City made an investigation.

The City admits that it is undisputed that the lift station was inoperative during the period from December 14, 1972, to March 1, 1973, and that a portable pump was used to by-pass the same. Although the sewage lines were originally correctly connected, it is conceded that an inspection conducted on March 1, 1973, showed that the pump had been incorrectly hooked up. However, the City points to the fact that one of its employees had to go to the lift station each day that the portable pump was used, start it, stay there until it was completed running, and turn it off. Since, the City contends, it would have been obvious to one on the scene that the pump was discharging into the wrong line, the City argues that the finding that the incorrect hook-up was made on February 5, 1973, when the pump was damaged and replaced, is contrary to the weight of the evidence. We disagree.

■ Certainly it was within the province of the jury to weigh the evidence and pass on the credibility of the witnesses who testified. At least three of the workmen who went to the lift station daily to operate the portable pump were known to Owen Holzheuser, City Director of Engineering Services, but they were not called to testify. In this situation, where evidence is peculiarly within the knowledge or control of a party, its failure to produce it raises the presumption that, if offered, the evidence or testimony would have been unfavorable to it. San Antonio & A. P. Ry. v. Blair, 184 S.W. 566 (Tex.Civ.App.—San Antonio 1916), writ ref'd 108 Tex. 434, 196 S.W. 502 (1917); 1 C. McCormick & R. Ray, Texas Evidence § 101 (2d. ed. 1956).

■ Looking to all the evidence in the record, we hold that the jury's answer to Special Issue No. 2, that the discharge continued for twenty-three days, is not contrary to the great weight and preponderance of the evidence. Appellant's points of error two and three are overruled.

By its fourth point of error, the City of Galveston complains that the trial court erred in submitting Special Issue No. 4 because it improperly placed the burden of proof. This issue inquired whether the City's failure to complete the chlorination facilities on or before May 1, 1973, was authorized by any rule, regulation, permit or other order of the Texas Water Quality Board, to which the jury answered, "We do not." The City contends by its fifth point of error, that the trial court erred in refusing to admit for all purposes its contract for the construction of the main treatment plant, which the Board had approved and which it argues provided for a completion date some time in July 1973.

Board Order No. 71–0715–1, issued by the Texas Water Quality Board to the City of Galveston on July 15, 1971, established a deadline for completion of chlorination facilities of November 1, 1972. The order itself provided that the Board intended

. . . that the City adhere to the dates established and unless the particu-

lar phase or portion of the improvement program due for completion is completed on or before the required date, *or unless the city has requested and the Board approved for acceptable reason or reasons an extension of the improvement program*; the Board herein places the City of Galveston on notice that it intends to seek such relief as may be indicated in the courts. (emphasis supplied)

In compliance with these provisions, the City of Galveston, on October 31, 1972, requested an extension of the deadline until May 1, 1973. The Board, at its regular meeting on November 29, 1972, granted the City's request. On June 1, 1973, one month after the May 1, 1973, deadline had expired, the City made a request for a further extension, which the Board on June 26, 1973, denied. The chlorination facilities were completed on September 26, 1973.

The City claims that by approving its document entitled "Contract Documents and Technical Specifications for Modifications to Main Sewage Treatment Plant," the Texas Water Quality Board authorized an extension of the completion date beyond May 1, 1973. This contract provided for seven month's construction time plus twenty-eight days for rain delay. The work began in early November 1972, which would allow for a deadline some time during the following July.

■ This contract was prepared by an engineering firm and submitted by the City to the Water Board as part of a grant application for federal funding to improve the City's sewage treatment facilities, pursuant to Public Law 660. In return for providing seventy-five percent of the funds to improve and enlarge the City's sewage treatment facilities, the Texas Water Quality Board and the Federal Environmental Protection Agency required that contract specifications be submitted for approval. This "contract" is, therefore, really a federal grant application, and its approval by the Board is no evidence that the Board approved extending the deadline for completion of the chlorination facilities in accordance with its order No. 71–0715–1. In fact, the language of the "contract" itself supports this construction. In the section entitled "Specifications and Contract Requirements for Work Eligible for Federal Participation Federal Water Pollution Control Act," we find the following paragraph:

> The contractor shall conform to all applicable federal, state, and local laws and the rules and regulations of all authorities having jurisdiction over the construction of the project. No statement or requirement in these specifications shall be construed to abrogate any applicable federal, state or local law. . ˙. .

Therefore, the fact that this "contract" was approved by the Texas Water Quality Board as part of the grant application for federal funds was not notification by the City of its failure to meet the Board ordered deadline nor was it a request for an extension of that deadline.

The trial court was correct in refusing to admit the "contract" for any purposes other than mitigation of penalties. It is clear that this document was properly considered by the jury for the purpose of mitigation, because it assessed the lowest penalty provided for by Section 21.252 of the Water Code for each day that the City violated the Board order's completion deadline. Appellant's fifth point of error is overruled.

■■ There being no evidence to support the City's contention that the Texas Water Quality Board had approved an extension of the deadline for the completion of chlorination facilities beyond May 1, 1973, we must overrule its point of error complaining that Special Issue No. 4, inquiring whether the Board had authorized the City's failure to meet the May 1 deadline, improperly placed the burden of proof. It was not necessary that this issue be submitted in order for the trial court to

hold that the City had violated the Water Board's order. The order, as extended, provided for a May 1, 1973, deadline. To Special Issue No. 5, inquiring what date the chlorination facilities were completed, the jury answered "September 26, 1973." In response to Special Issue No. 6, the jury assessed against the City a penalty of $50 for each day of the violation from May 1, 1973, to September 26, 1973. These two answers support the trial court's judgment. Since the City failed to offer proof that its failure to meet the May 1, 1973, deadline was authorized and since the trial court's judgment is independently supported by the jury's answers to two other special issues, the City was not entitled to the submission of Special Issue No. 4 and the question of whether it properly placed the burden of proof becomes moot. Therefore, the City's fourth point of error is overruled.

By its sixth point of error, the City of Galveston contends that the trial court erred in failing to admit its evidence of samplings and findings made in parts of Galveston County other than the sample stations designated for the City. The City argues that pollution reports from other areas in the county are highly relevant to the question of mitigation of penalties because they show that there are numerous instances where much higher counts of fecal organisms were found in the county's waters than were ever found at the English Bayou reporting station where the unauthorized discharges occurred. The City notes in this regard that the penalty which the jury assessed, $1000 a day for each day that the unauthorized discharges occurred, was the highest penalty provided by Section 21.252.

At the trial, the City offered the pollution reports for other cities in Galveston County for the purpose of showing " . . . what the degree of contamination is in this area." The State objected to this evidence. It pointed out to the court that sample reports from various stations around the City were already in evidence so that the jury had a sufficient basis for determining the degree of pollution in Galveston Bay. The trial court sustained the State's objection and denied admission of this evidence.

This is a statutory cause of action. A number of cases hold that once a violation of a statute has been established, evidence which balances the equities or weighs the degree of harm caused by the conduct is irrelevant. Gulf Holding Corporation v. Brazoria County, 497 S.W.2d 614 (Tex. Civ.App.—Houston [14th Dist.] 1973, writ ref'd n. r. e.); Langford v. Kraft, 498 S. W.2d 42 (Tex.Civ.App.—Beaumont 1973, writ ref'd n. r. e.); Ralph Williams Gulfgate Chrysler-Plym. v. State, 451 S.W.2d 267 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n. r. e.); Red Lake Fishing & Hunting Club v. Burleson, 219 S.W. 2d 115 (Tex.Civ.App.—Waco 1949, writ ref'd).

■ Equitable considerations are not relevant to the question of whether the City of Galveston violated the Texas Water Quality Act and the Board's orders promulgated thereunder. Since the City failed to request that these reports be considered by the jury solely on the issue of mitigation of penalties, and since their consideration by the jury on the issue of whether a violation had occurred would have prejudiced the State's case, we hold that the trial court acted well within its discretion in refusing to admit them into evidence. The jury had before it the reports of other sampling stations in the Galveston Bay area, and the reports offered by the City were not necessary in order for it to determine the degree of contamination in that area. Appellant's sixth point of error is overruled.

The trial court's judgment awarding the State $30,100 in penalties against the City of Galveston is in all things affirmed.

Affirmed.